[Civ. No. 27698. Second Dist., Div. One. July 9, 1964.]

LEO A. SZCZOTKA et al., Plaintiffs and Respondents, v. SOL M. IDELSON et al., Defendants and Appellants.

W. I. Gilbert, Jr., and Jean Wunderlich for Defendants and Appellants.

Milton Zerin for Plaintiffs and Respondents.

LILLIE, J.—Defendants appeal from a judgment declaring void and usurious a $60,000 note owned by them, as well as a second trust deed securing such obligation on certain motel property belonging to plaintiffs.[1] The judgment also permanently enjoined defendants from seeking the remedy of foreclosure otherwise available to them.

The subject litigation had its genesis in a three-cornered deal occurring in 1959. The pretrial order properly notes that the "case is somewhat complicated." In October or November of that year, the defendants employed one LaSatier, a real estate broker, to exchange their equity in an apartment building for a note and second trust deed. Mr. Idelson testified that "to be considered as a trade for tax purposes, it would have to show a three-way deal"—LaSatier would be a principal, as would Idelson and the party who eventually bought the Idelsons' equity. The subject $60,000 note was brought by LaSatier to Mr. Idelson's attention; bearing date

---

[1] The note and trust deed being governed by the same principles, they will be referred to hereinafter as the Idelson note.

of November 11, 1959, it was issued by F. C. Foster & Co. in favor of Oxwood Properties, Inc. An escrow at Wilshire Escrow Company was opened at the end of November for the purchase of this note. The escrow instructions fixed the payment price at $46,200. (This money was made available to defendants by LaSatier's sale of their equity to one Traub.)

In June of 1959, meantime, plaintiffs had opened an escrow at Occidental Escrow for the sale of their property to Foster. The subject note became part of that transaction. As amended in October of that year, the instructions provided that the sale would be subject to Lincoln Savings' first trust deed in the sum of $200,000, the balance of the purchase price ($230,083.61) to be represented by a note and trust deed in plaintiffs' favor. Plaintiffs, however, agreed that Foster could further encumber the property by a $60,000 note and trust deed (*the instruments here in suit*) to which, although subject to Lincoln's first trust deed, they would subordinate their own note and trust deed. The pertinent clause provided for the subordination of plaintiff's second trust deed "to a new loan of $60,000. . . . " There was testimony that plaintiffs consented to the above subordination because Foster needed money for the development costs of certain property in Santa Maria; there was also testimony that plaintiffs were to receive a note and trust deed on the Santa Maria property as additional security for the sale of their motel.

The case turned in considerable part on the manner in which the subject note was created. According to defendants, Foster owed Oxwood money and, to satisfy such obligation, executed the note and trust deed on November 11, 1959. The instrument was not, however, recorded until December 9. Also on November 11, there were recorded fractional assignments of the note and trust deed to one Mooshey and one Buch, being collateral for funds advanced in connection with the preliminary development of the Santa Maria property. When Oxwood sold the note to LaSatier, it received "approximately $42,000" in payment; from this money Mooshey and Buch were repaid the funds they had advanced. Accordingly, on December 16, the following instruments (all dated December 14) were recorded: a reassignment to Oxwood of Buch's interest; a reassignment to Oxwood of Mooshey's interest; and, finally, an assignment by Oxwood of its interest in the trust deed to LaSatier. On the following day (December 15) LaSatier transferred his interest to the defendants; this likewise was recorded on December 16. It was the

defendants' position that none of the foregoing transactions (with the exception, of course, of the transfer to LaSatier) were known either to them or to LaSatier.

According to plaintiffs, on the other hand, the note in suit was "manufactured" by Foster for the convenience of Oxwood and was, therefore, a mere sham. In this connection, there was testimony that the officers of both companies were closely associated. Foster's president was a Mr. Falconer; the president of Oxwood was a Mr. Firestone, Falconer's son-in-law. Each owned all the stock of the company he headed. Both companies had the same attorney and there was a working arrangement between them. Firestone testified that although Foster owed his company $165,000 at the time in question, no money passed from Oxwood to Foster for the $60,000 note; instead he apparently concentrated on selling the note to anybody who was interested. To this end it was turned over to a broker named Whitney; Mr. Walen, the president of Occidental Escrow, was asked by Firestone to "spread the word around" that the note was for sale. Walen himself testified that while paragraph (e) of the escrow provided that plaintiffs' second trust deed would be subordinate "to a new loan of $60,000 payable as per its terms," no money in that amount passed through his escrow. Although, as stated earlier, plaintiffs were told that Foster needed the money (assertedly realizable from the note) for development costs incident to the Santa Maria project, and although plaintiffs were given a trust deed on such property, a visit by plaintiffs to this property approximately one year after the close of escrow disclosed no improvements thereon.

It hardly becomes necessary for us now to state that Foster defaulted on the subject note and trust deed (as it also did in payments due to Lincoln Savings and to plaintiffs on their trust deed). Defendants thereupon instituted foreclosure proceedings, and plaintiffs in turn commenced this action. It proceeded to trial against only the Idelsons and the trustee of the deed of trust securing the $60,000 note.[2] The trial court agreed with plaintiffs that there was no consideration for the note; that it was issued as part of a plan whereby the payee would have the note for sale and would retain any sums it could realize therefrom; that this plan was effected

[2]Deeds in lieu of foreclosure were received by plaintiffs on the motel and the Santa Maria property. Although Foster, Oxwood and certain officers of both companies were joined as defendants, all defendants except the Idelsons settled the action with plaintiffs.

because of the close association of the officers of Oxwood and Foster, the result being that $42,000 was raised (and retained in various amounts between said parties) from its sale to defendants, and plaintiffs' property left responsible for payment of the note. In this connection, the court made a finding that LaSatier, as defendants' agent and during the course of his negotiations for the purchase of the note, knew that Oxwood paid nothing to Foster for either the note or trust deed, and that he also knew of the close association of the companies' officers. The court further found; in addition to the absence of any consideration, that the note, under all the circumstances, was usurious, and that no permit had been sought or obtained for the issuance of said instrument by Oxwood and Foster (both corporations) from the California Commissioner of Corporations.

To sustain the judgment appealed from upon the ground of failure of consideration, it must appear that the Idelsons were not holders in due course. Section 3139 of the Civil Code states: ''In the hands of any holder other than a holder in due course, a negotiable instrument is subject to the same defenses as if it were non-negotiable. . . . '' Section 3109 of the same code provides that ''Absence or failure of consideration is matter of defense as against any person not a holder in due course; . . . '' A holder in due course is defined by statute as one who takes the instrument when it is complete and regular upon its face, before it is overdue and without notice that it has been dishonored, if such is the fact, in good faith and for value, without notice at the time it is negotiated to him of any infirmity in the instrument or defect in the title of the person negotiating it (Civ. Code, § 3133).

■ Plaintiffs' brief contains the statement that ''The Court found the Idelsons were not holders in due course.'' While the record does not support such a broad statement, as noted above the court found that their agent, LaSatier, knew of the inequities which assertedly permeated the transaction between Oxwood and Foster, his lack of good faith thus being imputable to his principals, defendants have presented an elaborate argument in behalf of their claim that they meet all the requirements of the governing statute. However, the only point here in issue is whether they took ''in good faith and for value; . . . [without] notice of any infirmity in the instrument.'' (Civ. Code, § 3133, *supra*.)

To constitute a notice of an infirmity in a negotiable instrument, ''the person to whom it is negotiated must have

had actual knowledge of the infirmity . . . " or knowledge of such facts that his action in taking the instrument amounted to bad faith." (Civ. Code, § 3137.) ■ " 'The mere fact that a note is purchased for an amount less than its face, or that an unusually large discount is accepted, is never of itself sufficient to charge the purchaser with notice of existing equities, unless the consideration is merely nominal or the rate of discount so great as to compel the inference that the negotiation is fraudulent or in some way illegal or unauthorized.' " (*Mann* v. *Leasko,* 179 Cal.App.2d 692, 698 [4 Cal. Rptr. 124].) ■ The main thrust of plaintiffs' argument is that a solvent corporation would not sell its interest in a $60,000 loan for $42,000; that LaSatier "was putting together a three-way tax-free exchange" and therefore "knew important details concerning the $60,000 note about which he professed shocking ignorance." From this the conclusion is drawn that "reasonable persons cannot blindly shut their eyes to such simple reality." ■ But the question is not what a reasonable man would do under the circumstances or whether a reasonable man would make inquiries. ■ It has been consistently held that mere suspicion of infirmities does not preclude the transferee from occupying the position of holder in due course. (*Popp* v. *Exchange Bank,* 189 Cal. 296, 303 [208 P. 113].) ■ The cited case also holds that the circumstances or suspicions must be so "cogent and obvious" that to remain passive would amount to bad faith. To the same effect is *Christian* v. *California Bank,* 30 Cal.2d 421, 425 [182 P.2d 554]. ■ Of course, there is a special duty to make inquiry where an instrument is offered for sale at a price one-half or one-third less than its face (*Boyd* v. *Bearce,* 48 Cal.App. 46, 51 [191 P. 560]), although "an offer to sell a secured note for two thirds its value is not itself sufficient to raise an inference that the instrument is tainted." (*Anderson* v. *Lee,* 103 Cal.App.2d 24, 27 [228 P.2d 613].) ■ In this connection, it appears that defendants parted with an equity of $51,000 and that $46,200 was actually received by LaSatier; too, approximately $42,000 eventually reached Oxwood from LaSatier. Since there was evidence that 25 per cent was a customary discount in the business at the time in question, it appears that the discount offered and granted was not so "obvious" as to require inquiry.

■ Plaintiffs nevertheless argue that defendants and LaSatier had actual knowledge of the instrument's infirmity because they were furnished with certain "offset statements"

showing the true condition of the instrument, namely, that no payments had been made thereon; from this "and from the testimony" it is further argued that the court had the right to draw the permissible inference that the Idelsons and their agent were possessed of the actual knowledge which the law requires. However, we are pointed to no testimony that warrants the drawing of any such inference. It appears that the information given the Idelsons by LaSatier regarding the note took the form of a document reading in part as follows: "Second trust deed, $60,000, payable $600 per month, including 7 per cent interest due in 5 years, discount 25 per cent, 7 years old." Idelson testified that he associated "7 years old" with the age of the motel and did not discuss this feature of the transaction with LaSatier. Although defendants saw the motel (and talked to its manager), they did not see the note and offset statement until after the close of escrow. ▮ As for LaSatier, the decisions hold that a purchaser of negotiable paper before maturity need not make inquiry of the makers with respect to the consideration therefor and the circumstances leading up to its execution (*Witty v. Clinch*, 207 Cal. 779 [279 P. 797]); hence, even if it be assumed that he knew before the close of escrow that the note was not seven years old, the law placed on him no duty to investigate.

Nor is there any evidence to indicate that LaSatier or his principals were aware of the "close association" between Oxwood and Foster, their testimony being to the contrary. Neither LaSatier nor defendants were parties to the Occidental escrow; furthermore, both LaSatier and Firestone testified that the circumstances giving rise to the issuance of the note were not discussed. It is not enough for plaintiffs to say that LaSatier "must have" made inquiries of Firestone and discovered the prior history of the subject instruments. ▮ "The fact that a jury may disbelieve the testimony of a witness who testifies to the negative of an issue does not of itself furnish any evidence in support of the affirmative of that issue, and does not warrant a finding in the affirmative thereof unless there is other evidence in the case to support such affirmative." (*Marovich v. Central California T. Co.*, 191 Cal. 295, 304 [216 P. 595].) ▮ Every holder of a negotiable instrument being deemed prima facie to be a holder in due course (Civ. Code, § 3140), plaintiffs had the burden to prove otherwise. (*Mann v. Andrus*, 169 Cal.App.2d 455, 459 [337 P.2d 473].) We hold that the defendants took

in good faith and for value and without notice of the infirmities inherent in the instrument.

 Nor is there warrant under the facts and the applicable law for the finding that the note was usurious and, therefore, void. Parenthetically, there is no discussion of this point in plaintiffs' brief.[3] In the first place, it is problematical whether defendants could be considered as lenders. There is no testimony that they intended to lend money, least of all to plaintiffs. Be that as it may, we have already held that defendants were holders in due course; as such, they took the instrument free from the defense of usury. (*Brown* v. *Guaranty Mortgage Co.*, 220 Cal. 532, 534 [31 P.2d 788].)

 Additionally, "the fact that a promissory note secured by a trust deed is tainted with usury does not prevent foreclosure under the trust deed when there is default in payment of amount that is due on the note despite its usurious character." (49 Cal.Jur.2d 675.) The quoted statement of the law is contrary to the instant judgment which enjoins resort by defendants to the remedy of foreclosure.

 Finally, the claim is unsupportable that plaintiffs are entitled to relief because of noncompliance with the pertinent provisions of the Corporate Securities Act. It may be doubted whether the instrument was a "security" within the purview of the governing legislation. But even if that fact be assumed, plaintiffs are strangers to the contract. The law in this connection has been stated as follows: "Third parties who have no interest with respect to the alleged issuer or buyer of a security cannot raise the question of compliance with the Corporate Securities Law, and one who stands as a stranger to the invalid contract may not urge the invalidity as a defense in a collateral proceeding." (44 Cal.Jur.2d 544.)

Two notices of appeal have been filed in this proceeding. The first, dated October 30, 1962, is from an order then interlocutory in nature and must be dismissed. The second notice (dated April 24, 1963) is from the final judgment which, for the above reasons, we must reverse.

The judgment is reversed.

Wood, P. J., and Fourt, J., concurred.

---

[3]Prior to submission, plaintiffs orally cited an opinion of the attorney general (32 Ops.Cal.Atty.Gen. 9) which, they say, supports their position. A reading of that opinion discloses facts inapplicable to the case at bar.