[Civ. No. 41697. Second Dist., Div. Five. Apr. 15, 1974.]

HOLLYWOOD NATIONAL BANK, Plaintiff and Appellant, v.
INTERNATIONAL BUSINESS MACHINES CORPORATION et al.,
Defendants and Respondents.

608

## COUNSEL

Hindin, McKay, Levine & Glick, Allan L. Levine and Daniel B. Wilen for Plaintiff and Appellant.

Anderson, McPharlin & Conners and Luther L. Jensen for Defendants and Respondents.

## OPINION

**KAUS, P. J.**—Appeal from a judgment for all defendants in an action by plaintiff Hollywood National Bank ("Bank") against defendants IBM, the issuer, for specific performance to compel transfer of a 100-share IBM stock certificate; Hayden, Stone & Company ("Hayden Stone"), the true owner of the certificate, to quiet title; Morgan Guaranty Trust Company ("Morgan"), the original registrar on the stock certificate, for negligence; and one Kingston Deats, for money owing on an unpaid promissory note. The trial was to the court.

### FACTS

The evidence, sharply conflicting, is stated most favorably in support of the findings and the judgment.

The *dramatis personae* were: Harry Geyer, a branch manager for plaintiff Bank; Richard Kruglov, a customer of plaintiff Bank, who owned an apartment house he wanted to sell; Spencer, dead at the time of trial, a real estate and loan broker, acting for Kruglov; one McLeod, a false name, unavailable or in prison at the time of trial, who possessed stolen IBM stock; Elizabeth Russell, another real estate and loan broker, acting for McLeod; and defendant Deats, a real estate salesman who worked with Russell.

The various institutional defendants were sued based on their connection with the stolen certificate.

Kruglov owned an apartment house in Los Angeles which he wished to sell. He made an informal arrangement with a broker, Spencer, to secure a buyer. Kruglov was also a "very good customer" of the Bank.

In early May 1968, Russell received a series of phone calls from McLeod asking her to arrange a loan for him. McLeod had just set up a residence in Lake Tahoe; it was "very imperative" that he get a loan, but he could not just walk into a bank.

McLeod apparently told Russell that he had two 100-share IBM stock certificates;[1] in any event, they were mailed to Russell from Pittsburgh, Pennsylvania. The stock certificates were issued in 1963 by IBM in the name of Hayden Stone. They were negotiable; in July 1966, Hayden Stone stamped the certificate "Execution Guaranteed." As it turned out, the certificates had been stolen from defendant Hayden Stone.

Russell then phoned Spencer. Although the details are scanty, it appears that the quick loan wanted by McLeod was somehow tied into Kruglov's sale of the apartment house. Russell told Spencer about the IBM stock, and Spencer said he would be able to set up a bank loan.

On May 9 Russell took the certificates to Spencer. They then phoned IBM and were informed that the certificates were "not counterfeit."

Kruglov learned that the buyer—whether McLeod or Deats, the salesmen, becomes an issue—would need to secure a loan on the stock certificate in order to purchase Kruglov's apartment house. Probably on May

---

[1]Only one of the two certificates is involved in this case. The second certificate was used by McLeod, working through Spencer, to obtain a loan from a private party. Despite the apparent negotiability, this person was advised by his banker to obtain a release from Hayden Stone. Instead of the release, he got an almost immediate visit from the F.B.I.

Kruglov phoned plaintiff Bank and spoke to Geyer, and urged him to make the loan; Kruglov said it was "really important" to him.

That evening, McLeod phoned Russell to say that he could not be in Los Angeles the next day, the 10th, and that she or Deats should take the loan and property in their name and that he would later transfer the loan and property to his name.

The loan papers were signed on Friday, May 10, 1968. Geyer had learned defendant Deats' name no earlier than the day before, probably late Thursday, because it was not until Friday morning that he ran a credit check on Deats. The report he received indicated that Deats was not a very good credit risk. He never met Deats until the day the loan papers were signed.

On May 10, Friday morning, Deats, Spencer, and Russell went to the bank. Kruglov was there. As they approached Geyer, and before they were introduced, Geyer told Spencer that the loan had been approved. Deats showed Geyer the stock certificate. Geyer said the certificate was "as good as gold." Deats and Russell told Geyer they were acting as agents for another man. Geyer never asked Deats or Russell for the name of their principal, nor did he ask to see any proof of authority.

It was not until Deats got to the bank that he realized all the loan papers were going to be in his name. Geyer gave Deats a financial statement form and asked him to fill it out and mail it to Geyer in the next week or so.

The deal involved a loan in the amount of $35,000, secured by the IBM stock certificate, worth $70,000, and the opening of an escrow for the purchase of Kruglov's property. The escrow provided that the purchase was subject to the "buyer's approval of the subject property within 5 working days." All of the loan and escrow papers were in defendant Deats' name.

As soon as the loan papers were signed, a checking account with a deposit of $35,000, the amount of the loan, was opened in the names of Russell and Deats. According to Geyer, the loan proceeds were to be used for the purchase of the property from Kruglov. However, Russell and Deats told Geyer that they were under a "time pressure"; and their client needed $15,000 immediately. While the escrow papers for the sale of the Kruglov property were being processed, Geyer took care of drawing a $15,000 cashier's check payable to Western Union, which was wired to McLeod's son at Lake Tahoe.

The same day a check for $5,000 was drawn on the account. These pro-

ceeds were deposited into the escrow opened in connection with the sale of the Kruglov property. On May 13, a check for $5,000, payable to Spencer, was drawn on the account. When, on May 20, IBM phoned Geyer to tell him the stock was stolen, and the F.B.I. appeared, plaintiff Bank had paid out a total of $25,000. Needless to say, the loan was not collectible.

The certificate for 100 shares of IBM stock shows that it was issued in September 1963 and the owner is listed as Hayden Stone. The certificate, as noted, was negotiable. Geyer was not suspicious that the stock was in street name, rather than in Deats' or that of the unknown principal. He was not suspicious that the stock had been negotiable for about two years because of the date of the endorsement guarantee. He did not phone Hayden Stone before the loan was made because "it would have been 3 o'clock in New York, but I didn't see any necessity for a telephone call." However, after the loan was made, on May 10, Geyer wrote a letter to defendant Morgan, presumably because Morgan's name was printed on the 1963 certificate as the "Registrar." Geyer was not worried about the certificate. The only reason that he wrote to Morgan was "to complete our file so that the bank examiners . . . would see we were following all the avenues . . . to cover the bases."

Additional facts will be developed in the discussion.

## ISSUES

### Defendant IBM

Plaintiff's action against IBM was based on IBM's refusal to transfer registration of the certificate to plaintiff. Even though the certificate had been stolen and replacement stock issued,[2] plaintiff was entitled to demand that defendant IBM register the stock in its name, if it was a bona fide purchaser. (Cal. U. Com. Code, §§ 8401, subd. (1); 8405, subd. (3).)[3]

A "bona fide purchaser" is a "purchaser for value *in good faith and without notice of any adverse claim* who takes delivery of a security in

---

[2]The loser in this situation would be defendant Hayden Stone, which had the right to demand that defendant IBM issue a new security in place of the stolen security, provided, inter alia, that it posted an indemnity bond. (Cal. U. Com. Code, § 8405, subd. (2).) IBM could also recover the replacement certificate from Hayden Stone. (§ 8405, subd. (3).)

[3]All statutory references are to the Commercial Code.

bearer form or . . . registered form . . . indorsed to him or in blank . . . .".[4] (Italics added.) (§ 8302.)

"Good faith" means honesty "in fact" in the transaction. (§ 1201, subd. (19).) Negligence may be considered in determining honesty. (Cal. code comment to § 1201.)

A person has " 'notice' of a fact when . . . (c) From all the facts and circumstances known to him at the time in question he has reason to know that it exists." (§ 1201, subd. (25).)

Both plaintiff and defendants agree that the issues are whether plaintiff acted in "good faith" and was "without notice" that the stock certificate was stolen or in some other respect defective. We note at this point that the cases appear to blur the concepts of "bad faith" and "notice"; circumstances sufficient to place one on "notice" are sufficient to establish "bad faith." (E.g., *Christian* v. *California Bank*, 30 Cal.2d 421, 425 [182 P.2d 554], and cases collected.)

### Burden of Proof

█ Plaintiff contends that defendants had the burden of proving that plaintiff was not a bona fide purchaser; defendants contend that once they established that the security was stolen, plaintiff had the burden of proving he was a bona fide purchaser. We agree with defendants.

Plaintiff confuses the rule that theft is no defense to a claim by a bona fide purchaser, with the rule that when a defect is asserted, the plaintiff must prove that he is a bona fide purchaser.

Section 8105, subdivision (2) provides that in "any action on a security . . . (d) After it is shown that a defense or defect exists the plaintiff has the burden of establishing that he . . . is a person against whom the defense or defect is ineffective . . . ."

A bona fide purchaser acquires stock free of any "adverse claim." (§ 8301, subd. (2).) An "adverse claim" includes a claim that a "particular adverse person is the owner of . . . the security. . . ." (§ 8301, subd. (1).) To complete the circle, a bona fide purchaser is "without notice of any adverse claim. . . ." (§ 8302.)

---

[4]Similarly, a "holder in due course" is a holder who takes the instrument "(a) For value; and (b) In good faith; and (c) Without notice . . . of any defense against or claim to it . . . ." (§ 3302, subd. (1).) The definitions of "holder in due course" and "purchaser" are both derived from repealed Civil Code section 3133. (See Cal. comments to §§ 3302, 8302.)

Although the Commercial Code's division on investment securities (§§ 8101-8406) does not explicitly relate "adverse claim" to "defense or defect," it is clear from other contexts that the defense that a security is stolen does not defeat the claim of a bona fide purchaser, but does shift the burden to the purchaser of proving that he is bona fide. (§§ 3302, 3305, 3306, 3307, subd. (3).)

Thus, once defendants established by stipulation that the IBM certificate was stolen from Hayden Stone, plaintiff was required to prove its status as a bona fide purchaser.

Plaintiff's theory is simple: It is a bona fide purchaser, because its branch manager, Geyer, did not know the certificates were stolen—there never was any question that the certificates were genuine—and the rule is well-established that "mere suspicion of infirmities does not preclude the transferee from occupying the position of holder in due course." (*Szczotka* v. *Idelson,* 228 Cal.App.2d 399, 405 [39 Cal.Rptr. 466].) Simplicity, apparently, does not defeat the claim of a bona fide purchaser; the standard is not what a reasonable man would do under the circumstances. (*Szczotka* v. *Idelson, supra,* at p. 405.) Were bona fide purchasers or holders in due course required to act reasonably, the argument goes, the fabric of negotiability, the flak suit of commercial life, would be torn to shreds.[5]

The extent to which the commercial world could function under a law of reasonableness (cf. § 2103, subd. (1)(b)) is beyond the scope of this opinion. However, the protection afforded the bona fide purchaser—or holder in due course—does not yet permit persons seeking such status to refuse to see what is before their eyes. ▮ The holder of a negotiable instrument will be charged with a defect in that instrument when the circumstances are such as to justify the conclusion that the failure "to make inquiry arose from a suspicion that inquiry would disclose a vice or defect in the instrument . . . ." (*Christian* v. *California Bank, supra,* 30 Cal.2d 421, 425; *Anderson* v. *Lee,* 103 Cal.App.2d 24, 27 [228 P.2d 613].) " '[M]ere knowledge of facts sufficient to put a prudent man on inquiry, without actual knowledge, or mere suspicion of an infirmity or defect of title, does not preclude the transferee from occupying the position of a holder in due course, unless the circumstances or suspicions are so cogent and obvious that to remain passive would amount to bad faith.' " (*Popp* v. *Exchange Bank,* 189 Cal. 296, 303 [208 P. 113].)

---

[5]For a criticism of the subjective good-faith test established in *Popp* v. *Exchange Bank,* 189 Cal. 296 [208 P. 113], see *Morgan* v. *Reasor Corp.,* 69 Cal.2d 881, 891-892, fn. 16 [73 Cal.Rptr. 398, 447 P.2d 638].

The circumstances in this case do not involve "mere suspicion." Rather, Geyer's unwillingness to make any inquiries—other than a last-minute phone call to the credit bureau—indicate a studied refusal to make inquiries that were likely to "disclose a vice or defect . . . ." in a rush transaction that reeked of chicanery.

All parties agree that Geyer was not asked about the loan until, at most, two days before the loan papers were signed. The urgency for the loan was not explained. He was not told who would be signing the papers for the loan until, at most, the day before its consummation. At no time before then did he speak to Deats or to Russell; all his contacts were with his good customer, Kruglov, and Kruglov's broker, Spencer, whom Geyer had never met in person. The loan was "tentatively" approved despite Deats' poor credit, before Geyer saw the certificate or, for that matter, even before he knew that the certificate existed. No attempt was made to reconcile Deats' scanty and poor credit record with his possession of a $70,000 stock certificate. Although both Deats and Russell informed Geyer that they were acting as agents, at no time did Geyer even bother to ask the name of the principal, let alone demand proof of authority. At no time did Geyer ask Deats or Russell how they happened to have stock in the name of Hayden Stone. He paid no attention to the fact that the "Execution Guaranteed" stamp was two years old.

With the ink on the loan papers hardly dry, even though the proceeds were to be used in buying Kruglov's property, Geyer took care of obtaining a $15,000 cashier's check payable to Western Union, because Russell's and Deats' unnamed client had an urgent need for funds. Even the letter to Morgan, written after the loan was made, for the purpose—according to Geyer—of providing documentation of prudent conduct for the bank examiners, reflects a determined effort not to know: Morgan's name is printed on the certificate as of 1963; Geyer had no reason to believe that Morgan, even then only the registrar and not the transfer agent, was still connected with that particular issue of IBM stock in any way.

The evidence supports the finding that the Bank was not a bona fide purchaser.

*Liability of Hayden Stone*

On appeal plaintiff appears to have abandoned its claim against defendant Hayden Stone, the true owner of the shares. Abandoned or not, plaintiff provides no reasons for holding Hayden Stone, the victim of a stock theft, liable to another alleged victim.

**616**

### Liability of Morgan Guaranty Company

After the loan agreement was signed and a $15,000 cashier's check given to Deats and Russell, Geyer wrote to Morgan, whose name appeared on the stock certificate as "registrar." The letter asked Morgan to "take a look at the enclosed photocopy of the stock certificate, . . . and let us know if anything appears irregular. Please telephone us collect should it appear the certificate is not genuine." Of course, lack of genuineness is not plaintiff's problem.

Morgan received the letter on May 13. It was forwarded to IBM and received there on May 20.

■ Plaintiff contends that the delay of seven days was unreasonable and that if Morgan had acted reasonably, plaintiff could have stopped payment on some or all of the checks.

Plaintiff relies on Commercial Code section 8406, subdivision (1), which provides that a "registrar," among others, "is under a duty . . . to exercise good faith and due diligence in performing his functions; . . ."[6]

The contention is without merit. First, there is no evidence that Morgan was still the registrar on May 10, 1968, when plaintiff's letter was written. Whatever Morgan's duty might have been in September 1963 when the stock was issued, it would be unreasonable to hold that a registrar or transfer agent, at the time the stock was issued, is under a perpetual duty to holders or owners of stock.

Second, even as registrar in 1963, Morgan's functions were limited, and would probably not have included furnishing the information that plaintiff later obtained from defendant IBM. "The registrar's duty is simply to inspect the transaction from the standpoint of the capacity of the corporation to issue the particular shares; in effect, the registrar acts as an auditor. The registrar does not keep a list of the stockholders either under certificate numbers or under names of stockholders.[95]" Footnote 95 of the quoted passage provides in part as follows: "The transfer agent keeps both such lists at all times. . . ." (Ballantine & Sterling, Cal. Corporations Laws (4th ed.) § 211(5)(b), pp. 438-439; see also 2 Cal. Commercial Law (Cont. Ed.Bar) Investment Securities, § 13.52.)

Finally, the substance of the plaintiff's request to Morgan was to "tele-

---

[6]Plaintiff's reply brief inexplicably characterizes Morgan as the "transfer agent." The stock certificate, on which plaintiff otherwise relies, states that IBM was the transfer agent.

phone . . . collect should it appear the certificate is not genuine." The certificate was genuine, it was merely stolen.

### Liability of Deats

■ Plaintiff sued Deats on the $35,000 promissory note, alleging that $25,000 remained unpaid. The note was signed only by Deats. He did not file an answer; plaintiff entered a default against him. The trial court nevertheless found in favor of Deats, because Deats "revealed to Plaintiff that he was acting as an agent and not as principal . . . ." No brief has been filed by Deats.

Plaintiff contends that it is entitled to recover against Deats, because a default was taken and a prima facie showing made at the trial. We need not decide to what extent a trial court must ignore testimony favorable to a defaulting defendant, where a trial on the merits is held as to other defendants. The law is that Deats is liable on the note, even though the trial court found that he was a disclosed agent.

Deats testified, and the documentation shows, that the loan was taken in his name. He had no written authorization from his principal.[7] An agent who signs an agreement in his own name is personally liable unless he indicates "on the writing itself . . . his intention to bind the principal only." (*London* v. *Zachary,* 92 Cal.App.2d 654, 657 [207 P.2d 1067]; see also, *Firestone* v. *Wahl,* 133 Cal.App.2d 501, 504-505 [284 P.2d 499]; cf. *Gambord Meat Co.* v. *Corbari,* 109 Cal.App.2d 161, 162 [240 P.2d 342]; *Cline* v. *Atwood,* 241 Cal.App.2d 108, 113-114 [50 Cal.Rptr. 233]; see 1 Witkin, Summary of Cal. Law (8th ed. 1973) Agency and Employment, §§ 183-184, pp. 779-780.)

Moreover, where the writing is unambiguous on its face, extrinsic evidence is inadmissible to show that a person acted purely as an agent. (*Martindell* v. *Bodrero,* 256 Cal.App.2d 56, 61 [63 Cal.Rptr. 774]; *Firestone* v. *Wahl,* 133 Cal.App.2d 501, 504-505 [284 P.2d 499]; *Carlesimo* v. *Schwebel,* 87 Cal.App.2d 482, 487-488 [197 P.2d 167]; *Otis Elevator Co.* v. *Berry,* 28 Cal.App.2d 430, 432 [82 P.2d 704]; *Bank of America, etc. Assn.* v. *Goldstein,* 25 Cal.App.2d 37, 43-44 [76 P.2d 545]; *Broy* v. *Calaveras Central Gold Min. Co.,* 18 Cal.App.2d 371, 377-378 [64 P.2d 456]; *Van Haaren* v. *Whitmore,* 2 Cal.App.2d 632, 634-635 [38 P.2d 829].)[8]

---

[7]Russell testified that after the loan was made, McLeod "came in town" and gave Deats and her a power of attorney. No documents were ever produced.

[8]The issue here is not the impossibility "of perfect verbal expression," or finding a "meaning . . . to which the language of the instrument is reasonably susceptible"

Nor should plaintiff be estopped to rely on the parol evidence rule, because Geyer testified that in lending the money to Deats, Geyer was relying on the value of the collateral rather than on Deats' personal credit. That the lender did not rely on all of his contract rights in making a loan should not estop him from exercising them.

The trial court erred in entering judgment in favor of defendant Deats.

## FINDINGS

Finally, plaintiff Bank contends that the trial court erred in failing to make requested evidentiary findings. The trial court made extensive findings of fact and conclusions of law on every material issue. Basically, the findings requested by plaintiff were either recastings of findings made by the court in more favorable terms, extraneous findings, or findings of particular evidentiary facts, not required to be made by the trial court. (*Wishart* v. *Claudio,* 207 Cal.App.2d 151, 153 [24 Cal.Rptr. 398].) There was no error.

The judgment in favor of all defendants, except Deats, is affirmed. The judgment in favor of Deats is reversed.

Ashby, J., and Hastings, J., concurred.

---

(*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.,* 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]), or whether words "have absolute and constant referents" (*id.* at p. 38), or whether the "parties' understanding of the words used may have differed from the judge's understanding." (*Id.* at p. 39.) The simple issue here is whether Deats signed his name without explanation or qualification. He did.