[No. A096965. First Dist., Div. Five. Mar. 13, 2003.]

SUZANNE L. DECKER, as Trustee, etc., Plaintiff and Appellant, v. YORKTON SECURITIES, INC., et al., Defendants and Respondents.

## COUNSEL

Heller Ehrman, White & McAuliffe, L. J. Chris Martiniak and Joshua S. Levenberg for Plaintiff and Appellant.

Sideman & Bancroft, Gilda R. Turitz; Dorsey & Whitney, Stewart D. Aaron, Benjamin J. Catalano; Drinker Biddle & Reath, H. Christian L'Orange, Alan J. Lazarus and S. Fey Epling for Defendants and Respondents.

## OPINION

**STEVENS, Acting P. J.**—Suzanne L. Decker, as trustee for InnovaCom, Inc., appeals from a judgment entered after the trial court granted summary

judgment in favor of respondents Yorkton Securities, Inc. (Yorkton), and Wolverton Securities, Ltd. (Wolverton). In resolving this appeal, we consider when an introducing broker has notice of an adverse claim under California Uniform Commercial Code section 8105, subdivision (a)(2), such that it may be liable for losses sustained in connection with stolen stock certificates despite the immunity afforded by California Uniform Commercial Code section 8115, subdivision (3).[1] We conclude that notice of an adverse claim in this context requires subjective knowledge of a significant probability of an adverse claim, and we affirm the judgment.

## I. FACTS AND PROCEDURAL HISTORY

In July 1996, InnovaCom Corp., a Florida company, merged with Jettson Real Estate Development, Inc. (JRD). The resulting entity was renamed InnovaCom, Inc. (InnovaCom) and is the appellant in this action.[2] Around the time of the merger, persons associated with JRD, including Michael Haynes and David Jett (collectively the Conspirators), fraudulently caused the issuance of millions of dollars of InnovaCom stock, without consideration, to people who either did not exist or who never received the stock. As relevant here, several hundred thousand shares of unrestricted stock, represented by stock certificates 70-94, were issued in June 1996. An additional 4.4 million shares were issued in August 1996, represented by certificates 153-172.

The persons to whom the certificates were issued purportedly endorsed them for transfer to corporations controlled by Haynes. To accomplish this, the stock powers accompanying the certificates were endorsed "in blank," without naming the intended transferees. The signatures bore signature guarantee stamps, supposedly affixed by a Southern California branch of Wells Fargo Bank or a Southern California branch of First Interstate Bank. The stamps were counterfeit. The corporations then deposited the certificates with broker-dealers, including respondents Yorkton (certificates 83, 85, 93, 153, 167, and 170) and Wolverton (certificate 166).

### A. Certificates Deposited at Yorkton

Seven of the subject InnovaCom stock certificates were deposited with Yorkton by its customer, Whittington Investments Ltd. (Whittington), a corporation domiciled in the Bahamas. Each certificate was issued in the

---

[1] Unless otherwise indicated, all further section references are to the California Uniform Commercial Code.

[2] Appellant Suzanne L. Decker is purportedly the acting trustee of InnovaCom, which filed for bankruptcy protection in 2001. For clarity we refer to InnovaCom as the appellant.

name of a different individual, unknown to Yorkton, with addresses at various offices of Mail Boxes Etc., in cities around the country. The certificates were endorsed in blank, and ostensibly affixed with a signature guaranty stamp of Wells Fargo Bank or First Interstate Bank.

Yorkton confirmed that the certificates were endorsed and a signature guaranty accompanied each endorsement. It conducted no further investigation into the propriety of the certificates or Whittington's right to possess them, pursuant to its policy of relying on other entities in the securities transfer process (including transfer agents) to determine whether the certificates were stolen.

Yorkton then forwarded the certificates to InnovaCom's transfer agent, Atlas Stock Transfer Corporation (Atlas), for the purpose of converting the certificates to "street name," and thus enabling the shares to be traded on the public market. In this process, the transfer agent verifies that the certificate is valid and properly endorsed, cancels it, and issues a new certificate in the name of the broker, for the benefit of its customer. After this conversion, the new InnovaCom certificates were deposited into Yorkton's account at the Deposit Trust Corporation (DTC), a centralized, nationwide depository. At Whittington's direction, Yorkton thereafter caused the securities to be sold.

B.  *Certificate Deposited at Wolverton*

Wolverton received certificate 166 for deposit into the account of one of its customers, Securities Advisory Group, Inc. (SAG). The certificate, issued in the name of Ronald Ford, had been forwarded to Wolverton by SAG's president, M. Scott Mayer. Mayer advised that the shares had been transferred to SAG for services, and requested the shares be deposited into SAG's account. In a separate Federal Express package, SAG provided Wolverton with an "Irrevocable Stock or Bond Power" (Stock Power) endorsed in blank by Ford, an "Authority to Accept Securities," and a copy of certificate 166. The signature was affixed with a signature medallion guaranty stamp, purportedly from Wells Fargo Bank.

SAG requested that the certificate be processed quickly because it wanted to "trade the stock as soon as possible." SAG had apparently not paid anything for the certificate, at the time worth over $1.5 million, and Wolverton did not know how SAG had obtained the certificate or who Ford was. In addition, SAG's client application form had disclosed an unusual circumstance, in which the account was opened by an attorney in New York, for a California corporation (SAG), with a mail drop in New York and a bank account in California.

Wolverton confirmed that a third party release and endorsement accompanied the certificate and a guaranty stamp was affixed on the release. Pursuant to its standard policy, Wolverton did not investigate Ford's identity, how he obtained the certificate, or how and why SAG acquired it.

Wolverton sent the certificate to transfer agent Atlas for conversion into street name, and thereafter received the replacement certificate from Atlas, credited the shares to SAG's account, and sold the stock on the public market.

### C. *Litigation*

In early summer 1997, new management at InnovaCom reviewed Atlas's records and discovered the Conspirators' fraud. The following November, InnovaCom brought suit against numerous defendants, including the Conspirators. Defaults were entered against the Conspirators, and judgment was entered against Atlas for the wrongful transfer of the certificates. In March 2000, InnovaCom added Yorkton and Wolverton as defendants to its third amended complaint, alleging the brokers acted "negligently, without due care, and in conscious disregard of the obviously fraudulent nature of the stock certificates."

Yorkton and Wolverton each filed a motion for summary judgment or, in the alternative, summary adjudication. The brokers contended they were immune from liability pursuant to section 8115, because they did not have notice of InnovaCom's adverse claim to the certificates. (See §§ 8105, subd. (a)(2), 8115, subd. (3).) In response, InnovaCom submitted, among other things, the declaration of expert witness Charles Pease. Pease opined that a broker who accepts securities for deposit has a duty to guard against the introduction of stolen certificates into the marketplace, particularly if a large number of shares are involved or if certificates issued in the names of individuals are to be deposited into a corporate account.

The trial court granted Yorkton's summary judgment motion on February 13, 2001. Three days later, InnovaCom filed for bankruptcy protection. On February 23, 2001, Wolverton's motion for summary judgment was granted and judgment was accordingly entered in favor of Yorkton and Wolverton. This appeal followed.

## II. DISCUSSION

### A. *California Uniform Commercial Code Section 8115*

As a general proposition, section 8115 immunizes brokers from liability in connection with their activities as conduits for the transfer of

securities on behalf of their customers. (Cal. U. Com. Code com., 23 pt. 1 West's Ann. Cal. U. Com. Code (2002) foll. § 8115, com. 1, pp. 494-495.) There are, however, three enumerated exceptions to this immunity: an introducing broker is subject to liability where it (1) acted after being served with legal process enjoining it from acting; (2) acted in collusion with the wrongdoer in violating the rights of the adverse claimant; or, as relevant here (3) in the case of a stolen certificate, acted with notice of the adverse claim. (§ 8115.)[3]

The immunity provided by section 8115 reflects an intent to promote a predictable and efficient system for processing securities transactions by brokers and other securities intermediaries. As the official comments to section 8115 explain: "[i]t is essential to the securities settlement system that brokers and securities intermediaries be able to act promptly on the directions of their customers." (Cal. U. Com. Code com., 23 pt. 1 West's Ann. Cal. U. Com. Code, *supra*, foll. § 8115, com. 3, p. 495.) Thus, unless the certificate is stolen, a broker will not be liable even if it "has notice that someone asserts a claim to a customer's securities or security entitlements," because "the firm should not be placed in the position of having to make a legal judgment about the validity of the claim at the risk of liability either to its customer or to the third party for guessing wrong." (*Ibid.*)

Section 8115 also recognizes, however, that additional considerations arise where the stock certificates have been stolen. In that instance, the broker may be liable if it had notice of the adverse claim. The official comment 3 to section 8115 explains: "Paragraph (3) [of section 8115] takes a different approach in one limited class of cases, those where a customer sells stolen certificated securities through a securities firm. Here the policies that lead to protection of securities firms against assertions of other sorts of claims must be weighed against the desirability of having securities firms guard against the disposition of stolen securities. Accordingly, paragraph (3) denies protection to a broker . . . who receives a stolen security certificate from its customer, if the broker . . . had notice of adverse claims. The circumstances that give notice of adverse claims are specified in Section

---

[3]Section 8115 reads: "A securities intermediary that has transferred a financial asset pursuant to an effective entitlement order, or *a broker* or other agent or bailee *that has dealt with a financial asset at the direction of its customer or principal, is not liable to a person having an adverse claim to the financial asset, unless the* securities intermediary, or *broker* or other agent or bailee did one or more of the following: [¶] (1) Took the action after it had been served with an injunction, restraining order, or other legal process enjoining it from doing so, issued by a court of competent jurisdiction, and had a reasonable opportunity to act on the injunction, restraining order, or other legal process. [¶] (2) Acted in collusion with the wrongdoer in violating the rights of the adverse claimant. [¶] (3) *In the case of a security certificate that has been stolen, acted with notice of the adverse claim.*" (Italics added.)

8-105." (Cal. U. Com. Code com., 23B pt. 1 West's Ann. Cal. U. Com. Code, *supra*, foll. § 8115, com. 3, p. 495.)

The parties raise two issues in regard to the meaning of section 8115, subdivision (3): were the certificates "stolen" within the meaning of section 8115, subdivision (3); and what constitutes "notice of adverse claims."[4] Because our determination of the latter issue confirms that Yorkton and Wolverton were entitled to summary judgment, we need not, and do not, address whether the certificates were "stolen."

### B. *Notice of Adverse Claims*

Section 8105, subdivision (a), defines the phrase "notice of an adverse claim" for purposes of section 8115, subdivision (3). (Cal. U. Com. Code com., 23B pt. 1 West's Ann. Cal. U. Com. Code, *supra*, foll. § 8115, com. 3, p. 495.) As relevant here, section 8105, subdivision (a), provides: "A [broker] has notice of an adverse claim if . . . [¶] . . . [¶] . . . [t]he [broker] is aware of facts sufficient to indicate that there is a significant probability that the adverse claim exists and deliberately avoids information that would establish the existence of the adverse claim."[5] (§ 8105, subd. (a)(2).)

InnovaCom contends the first part of the test—"aware of facts sufficient to indicate that there is a significant probability that the adverse claim exists"—reflects a standard that is in part objective: the broker must be aware of facts that would lead a reasonable broker to discern a significant probability of an adverse claim. Yorkton and Wolverton, on the other hand, contend a wholly subjective standard was intended: that the facts known to the broker actually led it to believe there was a significant probability of an adverse claim. The interpretation of section 8105, subdivision (a)(2), in this regard appears to be a matter of first impression.

For a number of reasons, we conclude that the first part of section 8105, subdivision (a)(2), sets forth a subjective standard. In the first place, the

---

[4]It is undisputed InnovaCom had an "adverse claim," which is defined as "a claim that a claimant has a property interest in a financial asset and that it is a violation of the rights of the claimant for another person to hold, transfer, or deal with the financial asset." (§ 8102, subd. (a)(1).)

[5]Section 8105, subdivision (a), reads: "A person has notice of an adverse claim if any of the following applies: [¶] (1) The person knows of the adverse claim. [¶] (2) The person is aware of facts sufficient to indicate that there is a significant probability that the adverse claim exists and deliberately avoids information that would establish the existence of the adverse claim. [¶] (3) The person has a duty, imposed by statute or regulation, to investigate whether an adverse claim exists, and the investigation so required would establish the existence of the adverse claim."

plain meaning of the subdivision compels this result. The second part of the test in section 8105, subdivision (a)(2), pertaining to *deliberate* avoidance of further information that would establish the claim's existence, indicates a decision by the broker to avoid facts that would have confirmed the claim it suspected. Only a broker with a subjective belief in the probability of the claim could "deliberately" avoid the information confirming its existence.

Second, comment 1 to section 8105 provides that "notice" in section 8105 is *not* merely inquiry notice or constructive notice. Comment 1 to section 8105 reads in part: "The general Article 1 definition of 'notice' in Section 1-201(25)—which provides that a person has notice of a fact if 'from all the facts and circumstances known to him at the time in question he has reason to know that it exists'—does *not* apply to the interpretation of 'notice of adverse claims.'" (Cal. U. Com. Code com., 23B pt. 1 West's Ann. Cal. U. Com. Code, *supra*, foll. § 8105, 7 com. 1, ¶ 2, p. 467, italics added.)

Third, comment 4 to section 8105 advises that subdivision (a)(2) codifies the "willful blindness" test, and confirms the test has a subjective component. Comment 4 to section 8105 explains: "Paragraph (a)(2) provides that a person has notice of an adverse claim if the person *is aware of* a significant probability that an adverse claim exists and deliberately avoids information that might establish the existence of the adverse claim. This is intended to codify the 'willful blindness' test that has been applied in such cases. See *May v. Chapman*, 16 M. & W. 355, 153 Eng. Rep. 1225 (1847); *Goodman v. Simonds*, 61 U.S. (20 How.) 343 [15 L.Ed. 934] (1857) [(*Goodman*)]." (Cal. U. Com. Code com., 23B pt. 1 West's Ann. Cal. U. Com. Code, *supra*, foll. § 8105, com. 4, p. 467, italics added.)

Comment 4 to section 8105 continues: "The first prong of the willful blindness test of paragraph (a)(2) turns on whether the person is aware [of] facts sufficient to indicate that there is a significant probability that an adverse claim exists. The 'awareness' aspect necessarily turns on the actor's state of mind. Whether facts known to a person *make the person aware of* a 'significant probability' that an adverse claim exists turns on facts about the world and the conclusions that would be drawn from those facts, taking account of the experience and position of the person in question." (Cal. U. Com. Code com., 23B pt. 1 West's Ann. Cal. U. Com. Code, *supra*, foll. § 8105, com. 4, ¶ 2, pp. 467-468, italics added.) Comment 4 thus indicates that the trier of fact may consider the broker's understanding, experience, and position in determining whether the broker was subjectively "aware of" a significant probability of an adverse claim.

Finally, the last paragraph of comment 4 to section 8105 reads: "The second prong of the willful blindness test of paragraph (a)(2) turns on

whether the person 'deliberately avoids information' that would establish the existence of the adverse claim. The test is the character of the person's response to the information the person has. The question is whether the person deliberately failed to seek further information *because of concern that suspicions* would be confirmed." (Cal. U. Com. Code com., 23B pt. 1 West's Ann. Cal. U. Com. Code, *supra*, foll. § 8105, com. 4, ¶ 3, p. 468, italics added.) The reference to "suspicions" presupposes a subjective awareness of the significant probability of an adverse claim. Comment 4 thus makes clear that a broker does not have notice of an adverse claim, within the meaning of section 8105, subdivision (a)(2), and section 8115, subdivision (3), unless the facts known to the broker actually made it "aware of a significant probability that an adverse claim exists," or created a "suspicion[]" of an adverse claim.[6]

InnovaCom's arguments to the contrary are unpersuasive. It asserts the standard in section 8105, subdivision (a)(2), is analogous to the duties of inquiry notice imposed on those receiving or handling other types of financial instruments, relying on *In re Marriage of Cloney* (2001) 91 Cal.App.4th 429, 442 [110 Cal.Rptr.2d 615] (*Cloney*). However, *Cloney* addressed the type of notice arising as a matter of law from recorded liens on real property. There, a purchaser obtained real property from a seller who held title as "Mike Cloney." A judgment had been recorded against "James Michael Cloney," creating a lien against all real property he owned in the county. (See Code Civ. Proc., § 697.320, subd. (a)(1).) Because the escrow agent's actual knowledge of Cloney's full name was imputed to the purchaser, by operation of law the purchaser had constructive notice of the judgment lien recorded against the seller, and took title subject to the lien. (*Cloney, supra*, at p. 442.) InnovaCom does not demonstrate that the constructive notice ascribed to purchasers of real property from recorded judgment liens should also be ascribed to introducing brokers based on securities certificates. Nor do we see any reason to draw a parallel between these distinct circumstances, in light of the plain terms of section 8105, subdivision (a)(2).

InnovaCom maintains that the definition of notice in section 8105, subdivision (a)(2), tracks the language of Civil Code section 19, pertaining to constructive notice: "Every person who has actual notice of circumstances

---

[6]InnovaCom itself cites to the following passage in *Goodman, supra*, 61 U.S. at pages 366-367 [15 L.Ed. at page 942], which it characterizes as the "leading American decision forming the basis of the willful blindness test": "Every one must conduct himself honestly in respect to the antecedent parties, when he takes negotiable paper, in order to acquire a title which will shield him against prior equities. *While he is not obliged to make inquiries*, he must not willfully shut his eyes to the means of knowledge which he knows are at hand . . . for the reason that such conduct, whether equivalent to notice or not, would be plenary evidence of bad faith." (Italics added.)

sufficient to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact." (Civ. Code, § 19.) However, since section 8105, subdivision (a)(2), derived from the Uniform Commercial Code, and its language is markedly different from the language of Civil Code section 19, there is no indication section 8105, subdivision (a)(2), was patterned after Civil Code section 19. At any rate, as we have already noted, the official comments to section 8105 demonstrate that neither inquiry notice nor constructive notice of a significant probability of an adverse claim will suffice.

Noting that official comment 3 to section 8115 indicates that brokers should face the same liability for selling stolen certificates as purchasers face for buying them, InnovaCom relies on the bona fide purchaser decision in *Hollywood Nat. Bank v. International Business Machines Corp.* (1974) 38 Cal.App.3d 607 [113 Cal.Rptr. 494] (*Hollywood*). In that case, a bank had accepted an IBM stock certificate as collateral for a loan, unaware the certificate was stolen. When the loan became uncollectible, the bank sought to compel IBM to transfer registration of the certificate to the bank as a bona fide purchaser. (See §§ 8401, subd. (a)(1), 8405, subd. (a)(3).) The court looked to section 8302, in which a bona fide purchaser is defined as a purchaser who, among other things, purchases for value in good faith and without notice of an adverse claim. The court then applied section 1201, subdivision (25)(c), by which a person has notice of a fact when "[f]rom all the facts and circumstances known to him at the time in question, he or she has reason to know that it exists." (§ 1201, subd. (25)(c).) Although the bank's branch manager did not actually know the certificate was stolen, in "a studied refusal to make inquiries that were likely to 'disclose a vice or defect' " he made no attempt to confirm the borrower's right to the certificate even though the transaction "reeked of chicanery." (*Hollywood, supra,* at p. 615.) Consequently, the bank was found to have sufficient knowledge, under section 1201, subdivision (25)(c), to preclude bona fide purchaser status.

*Hollywood* is of little help to InnovaCom. First, *Hollywood* was decided under the definition of notice set forth in *section 1201, subdivision (25)(c),* before the current revisions to division 8 of the California Uniform Commercial Code. Official comment 1 to section 8105 now provides that the "definition of 'notice' in Section 1-201(25) . . . does *not* apply to the interpretation of 'notice of adverse claims.' " (Cal. U. Com. Code com., 23B pt. 1 West's Ann. Cal. U. Com. Code, *supra,* foll. § 8105, com. 1, ¶ 2, p. 467, italics added.)

Second, a close reading of *Hollywood* undermines InnovaCom's position. The court in *Hollywood* explained its ruling as follows: "[T]he protection

afforded the bona fide purchaser—or holder in due course—does not yet permit persons seeking such status to *refuse* to see what is before their eyes. The holder of a negotiable instrument will be charged with a defect in that instrument when the circumstances are such as to justify the conclusion that the failure 'to make inquiry arose *from a suspicion that inquiry would disclose a vice or defect in the instrument . . . .*' [Citations.]" (*Hollywood, supra,* 38 Cal.App.3d at p. 614, italics added.) Thus, if *Hollywood* pertains at all to section 8105, subdivision (a)(2), it is to the *second* prong of the subdivision, referring to the broker's deliberate avoidance of information that would confirm his *subjective* suspicion—i.e., a belief in the significant probability of an adverse claim. (See Cal. U. Com. Code com., 23B pt. 1 West's Ann. Cal. U. Com. Code, *supra,* foll. § 8105, com. 4, ¶ 3, p. 467 [as to the second prong of § 8105, subd. (a)(2), "[t]he question is whether the person deliberately failed to seek further information because of concern that suspicions would be confirmed"].) Nothing in that decision suggests liability should attach to a broker who allegedly *should have* known of a significant probability of an adverse claim (as opposed to one who subjectively knows of a significant probability but then deliberately avoids confirming it). Indeed, the court in *Hollywood* described the underlying standard as a "*subjective* good-faith test." (*Hollywood, supra,* at p. 614, fn. 5, italics added.)

InnovaCom also claims that a subjective standard is inconsistent with the introducing broker's obligation to perform a "gatekeeping" function in protecting the securities market from forged or stolen certificates. According to InnovaCom, the introducing broker is in the best position to serve this function, because unlike other parties in the securities clearing process, it has a direct relationship with the depositor, knowledge of the circumstances of the deposit, and the opportunity to make inquiries into suspicious circumstances. Nowhere in the relevant statutes or the official comments, however, is there any characterization of the introducing broker as a "gatekeeper."[7] And even if the broker held such a position, the requirement that the broker

---

[7]InnovaCom appears to acquire this term from Pease and an internal Wolverton document reciting the following language from a Vancouver Stock Exchange memorandum: "[t]he role of the Member and its employees in upholding the integrity of the marketplace (the role of the 'Gatekeeper') continues to be of major importance. . . . [I]f the [broker] becomes aware, through knowledge of the client or otherwise, that the intention or effect of the trading by a client would be in breach of the Securities Act or impugn the integrity of the marketplace, then it is incumbent on the . . . [broker] in the capacity as 'Gatekeeper' within the Securities Industry, to draw the matter to the attention of Management of the firm . . . . The Exchange assumes that [brokers] are aware of possible signs of manipulations. [Brokers] are in fact in the best position to be aware of any market scheme at its outset, because of their knowledge of their clients and their trading patterns." Wolverton protests that InnovaCom has taken the memorandum out of context. Regardless, it does not compel the conclusion that section 8105, subdivision (a)(2), is satisfied by inquiry or constructive notice.

have an actual belief of a significant probability of an adverse claim reflects an adequate balance between a gatekeeping function and the need for efficient processing of the transfer of securities.

Presumably cognizant of the capacities and relationships of the entities involved in the transfer of stock certificates, the framers of division 8 of the California Uniform Commercial Code opted to place the onus of investigation on transfer agents rather than introducing brokers. In stark contrast to the general *limitation* of liability for introducing brokers, the code imposes on transfer agents strict liability for failure to satisfy certain affirmative obligations in registering the transfer of a certificate. Among other things, the transfer agent has an express statutory obligation to confirm that: (1) the person seeking registration of the transfer is eligible to have the security registered in its name; (2) the endorsement is made by the appropriate person or his authorized agent; (3) reasonable assurance is given that the endorsement is genuine and authorized; (4) the transfer does not violate certain restrictions; and (5) the transfer is in fact rightful or to a protected purchaser. (§ 8401, subd. (a); see also §§ 8402, coms. 1 & 2, 8404, 8407 [transfer agent is subject to the same law and liability as an "issuer"].) Furthermore, federal regulations require the transfer agent to establish written standards for the acceptance of signature medallion guarantees (17 C.F.R. § 240.17Ad-15(c) (2002)) and to maintain a file containing the identities and addresses of the issuer's registered security holders (17 C.F.R. §§ 240.17Ad-9 (2002), 240.17Ad-17(a)(1) (2002)).

In the end, the statutory language, official comments, and statutory scheme all lead us to the following conclusion: an introducing broker does not have actual notice of an adverse claim within the meaning of section 8105, subdivision (a)(2), unless it believes there is a significant probability of an adverse claim and nevertheless deliberately avoids further information that would confirm its suspicion.[8]

---

[8]Yorkton insists the requisite belief must reside with the persons who actually reviewed the certificate, and the knowledge of other employees cannot be considered. Comment 4 to section 8105, by contrast, suggests the relevant sources of knowledge are the employees involved in the *transaction*, which might include additional persons. Comment 4 to section 8105 states: "Application of the 'deliberate avoidance' test to a transaction by an organization focuses on the knowledge and the actions of the individual or individuals *conducting the transaction* on behalf of the organization. Thus, an organization that purchases a security is not willfully blind to an adverse claim unless *the officers or agents who conducted that purchase transaction* are willfully blind to the adverse claim. Under the two prongs of the willful blindness test, the *individual or individuals conducting a transaction* must know of facts indicating a substantial probability that the adverse claim exists and deliberately fail to seek further information that might confirm or refute the indication. For this purpose,

## C. *Triable Issue of Material Fact*

■ In light of our conclusion regarding the standard in section 8105, subdivision (a)(2), it is immaterial whether InnovaCom's evidence suggested the brokers *should have* suspected a significant probability of an adverse claim. We must nevertheless determine whether InnovaCom's evidence was such that a reasonable juror could conclude, based on the facts of which Wolverton and Yorkton were aware, that Wolverton or Yorkton *did* suspect there was a significant probability of an adverse claim.

### 1. *Yorkton's Knowledge*

InnovaCom did not claim, and offers no direct evidence, that Yorkton actually believed there was a significant probability of an adverse claim. Rather, it presented evidence that Yorkton knew its Bahamas-based customer, Whittington, had presented seven stock certificates representing a large number of shares of InnovaCom stock; the certificates bore original corporate signatures and an embossed corporate seal, even though the agents who initially issue certificates typically affix facsimile signatures and do not have access to the corporate seal; the certificates were issued in the names of separate individuals, unknown to Yorkton, who had purportedly endorsed the certificates in blank; and the signature medallion guaranty stamps purported to come from a single branch of Wells Fargo Bank or First Interstate Bank, even though the endorsers were located in different parts of the country. The guaranty stamps, InnovaCom argues, were noticeably counterfeit. Furthermore, the Yorkton personnel involved in the transactions would have perceived the significance of these matters, in light of their professional experience in the brokerage business.

There is, however, no evidence that any of these matters caused Yorkton personnel to believe the certificates were stolen, or captured Yorkton's attention at all. Endorsement in blank is a method of transfer expressly *authorized* by California statute. (See § 8304, subd. (a) ["An endorsement may be in blank or special"].) There is no showing an introducing broker should think a stock certificate is stolen merely because the certificate is presented by a Bahamas corporation, or because it reflects a large number of

---

*information known to individuals within an organization who are not conducting or aware of a transaction, but not forwarded to the individuals conducting the transaction, is not pertinent in determining whether the individuals conducting the transaction had knowledge of a substantial probability of the existence of the adverse claim."* (Cal. U. Com. Code com., 23B pt. 1 West's Ann. Cal. U. Com. Code, *supra,* foll. § 8105, com. 4, ¶ 4, p. 468, italics added.) We need not decide this matter, however, because InnovaCom's evidence of the information known to *any and all* persons associated with Yorkton (or Wolverton)—not merely those who reviewed the certificates—does not create a triable issue of material fact. (See pt. C., *post.*)

shares. Nor is there any evidence an introducing broker would discern the significance of an embossed seal and original corporate signatures or find it important to examine which particular bank branch had issued the guaranty stamp. Furthermore, InnovaCom fails to identify any financial incentive for Yorkton to conduct the type of extended investigation necessary to detect and evaluate the purported oddities of the certificates, especially in light of the great volume of certificates it had to review.

Similarly, there is no evidence Yorkton noticed the counterfeit nature of the signature guaranty stamps. InnovaCom's certified forensic document examiner uncovered the counterfeits by conducting a microscopic comparison to a genuine set of stamps and an infrared examination of the ink. Yorkton did not conduct these tests. Although another InnovaCom expert opined, "[o]ne can simply look at the color to see that these stamps are counterfeit," there is no evidence Yorkton examined the color of the stamps for this purpose. Nor does the record demonstrate that Yorkton employees were formally trained to examine signature guaranty stamps for proper size, shape, font, or ink color.[9]

In fact, it appears the signature guaranty stamps would have had significance for the transfer agent, not the introducing broker. The record includes a letter to InnovaCom's counsel from Andrew Massa, president of STAMP, Inc., explaining the significance of signature medallion stamps to *transfer agents*. In pertinent part, Massa writes: "Transfer agents risk liability if they transfer a stock certificate which does not carry a proper endorsement. Because of that risk, *transfer agents* generally require some method of validating the signatures on the certificates or accompanying documents. . . . [¶] . . . [¶] The controlled formula ink and the strict specifications for manufacture ensure that the color and appearance of STAMP Signature Medallion stamps will be uniform and recognizable *to transfer agents who must rely on the stamps as a guaranty of the validity of signatures on stock certificate documents*." (Italics added.) While Massa did not indicate what import the stamps might have for introducing brokers, the letter certainly highlights the importance for transfer agents.

From the evidence InnovaCom submitted, no reasonable juror could conclude Yorkton *knew* there was a significant probability of an adverse claim. Because InnovaCom has not demonstrated a triable issue of material fact, Yorkton was entitled to summary judgment.

---

[9]The declaration of Pease pertains to the investigation an introducing broker should make, not the significance the broker would attach to the peculiarities of the InnovaCom certificates. While he opines that a notarized guaranty on the third party release is preferable to a signature medallion guaranty stamp, he does not assert that the presence of a signature medallion guaranty stamp would give rise to a suspicion of an adverse claim.

## 2. *Wolverton*

■ InnovaCom did not contend, and presents no direct evidence, that Wolverton actually believed there was a significant probability of an adverse claim. It asserts instead that Wolverton received from its client, SAG, a certificate purportedly representing 220,000 shares of InnovaCom stock; the certificate identified its registered owner as Ford, who had purportedly signed the stock power in blank; and his signature appeared to be guaranteed with a Wells Fargo Bank medallion guaranty stamp that turned out to be counterfeit. In addition, SAG requested that the certificate be processed quickly because it wanted to "trade the stock as soon as possible."

For the reasons discussed *ante* as to the Yorkton transactions, this evidence does not create a triable issue of material fact as to Wolverton's notice of an adverse claim. There is no indication that any of the purported peculiarities in the certificate made Wolverton think there was a significant probability the certificate was stolen or an adverse claim existed. Further, since only one certificate was presented to Wolverton, it had no opportunity to note the purported oddity that endorsers from various parts of the country had obtained signature guarantee stamps from banks in Southern California.

InnovaCom points out that SAG's client application form indicated its account was opened by a New York attorney for a purported California corporation with a mail drop in New York and a bank account in California. This situation was unusual enough, Wolverton conceded, that it might ordinarily cause the registered representative to take some further action, such as checking with its head broker. There is no evidence, however, that California corporations that have a lawyer and mailing address in New York are likely to deal in stolen certificates, or that the location of SAG's attorney and bank account caused Wolverton to suspect certificate 166 was stolen.

InnovaCom also points to the fact that Wolverton had never heard of Ford, did not know how SAG obtained the $1.5 million certificate, and knew that SAG had not paid for it. However, these matters pertaining to Wolverton's *lack* of knowledge do not create a triable issue as to whether Wolverton in fact knew there was a significant probability of an adverse claim.

We conclude on this record that no reasonable juror could find that Wolverton believed there was a significant probability of an adverse claim. Wolverton was entitled to summary judgment.[10]

---

[10]Wolverton also argues it could not have been aware of an adverse claim, because no adverse claim existed until InnovaCom claimed the fraud in August 1997. We do not address

III. Disposition

The judgment is affirmed.

Simons, J., and Gemello, J., concurred.

---

this issue in light of our conclusion that InnovaCom failed to demonstrate a triable issue of material fact.