UNITED STATES FIDELITY & GUAR-
ANTY COMPANY, Plaintiff-Appellant,

v.

ROYAL NATIONAL BANK OF NEW
YORK and Merrill Lynch, Pierce, Fenner
& Smith, Inc., Defendants-Appellees.

Nos. 43, 188, Dockets 76–7067, 76–7088.

United States Court of Appeals,
Second Circuit.

Argued Oct. 22, 1976.

Decided Dec. 14, 1976.

Alfred S. Julien, New York City (Julien
& Schlesinger, David Jaroslawicz, Stuart A.
Schlesinger, Samuel Komoroff, New York
City, of counsel), for plaintiff-appellant.

William Hart, New York City (Hart & Hume, Robert B. Leonard, New York City, of counsel), for defendant-appellee, Royal National Bank of New York.

Samuel Halpern, New York City (Konheim, Halpern & Bleiwas, New York City), for defendant-appellee, Merrill Lynch, Pierce, Fenner & Smith, Inc.

Before FRIENDLY, HAYS and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

The plaintiff, United States Fidelity and Guaranty Company (USF&G) appeals from an order and judgment of Hon. Henry F. Werker, United States District Court for the Southern District of New York, entered on January 15, 1976 dismissing its complaint and awarding judgment to the defendants. USF&G had brought an action for conversion against the defendants Royal National Bank of New York (Royal) and Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch) for cashing United States Treasury Notes having a face value of $212,000. The notes were alleged to have been stolen from W. E. Hutton & Company (Hutton), insured against the loss by USF&G which, upon payment of the claim, became subrogated to and was assigned the cause of action against the defendants. After a four-day bench trial in August, 1975, Judge Werker filed an opinion on January 12, 1976, reported at 413 F.Supp. 43, finding that Royal had been authorized to sell the notes by its customer Frank Mazzochi, Jr., had acted in good faith observing reasonable commercial standards as his agent and thus was shielded from liability by N.Y. U.C.C. § 8–318. He further found that Merrill Lynch was a bona fide purchaser of the bills, that it had the right to rely on its customer Royal and consequently that there was no violation of Rule 405 of the New York Stock Exchange. We affirm.

I

Sometime between May and August 1966, United States Treasury Notes disappeared from the vault of the Bankers Trust Co. where they had been deposited by Hutton for safekeeping. On August 4, 1966 Mazzochi appeared at Royal's branch bank at 149th Street in the Bronx and presented a $10,000 United States Treasury Note which he stated he wished to cash. This note and those subsequently presented by Mazzochi were among those missing from the Bankers Trust vault. The notes were in bearer form, were due November 15, 1970 and all bore a 5% interest rate. (Mazzochi was later convicted in a state court of criminally concealing and withholding stolen property.)

Mazzochi was no stranger to the bank. He was introduced to Royal in 1965 by local businessmen as the new president of the Mutual Credit Union (Mutual) which had an account at Royal since 1951. The clerical details of the August 4 transaction as well as those subsequent were handled by Rudolph Santoro who was acting head of the loan department of the Royal branch. Mazzochi was referred by Santoro to Robert Kayner, a credit officer of the bank. Kayner had known Mazzochi for six months to a year, as a bank customer with several business accounts. He further knew that he was the president of Mutual which was an account well known to Royal. Mazzochi told Kayner that he was selling the note which belonged to his family. Although he wished a bank check in payment, he was persuaded to open a personal checking account in which the proceeds from the sale of the note would be deposited. Kayner approved the sale and on August 5 the notes were sold by Royal to Merrill Lynch "for the account of Frank Mazzochi, Jr." On August 5 and on August 9 Mazzochi made his second and third visits to the bank with Treasury Notes totalling $130,000. In both cases Santoro handled the clerical details, Kayner approved the transactions and the order for the sale was placed with Merrill Lynch. As the result of these three transactions Royal had credited to Mazzochi's personal checking account the sum of $140,192.12.

Mazzochi commenced his cash withdrawals on August 9 when he took out $35,000;

on August 10 he withdrew $13,000 and thereafter he withdrew $10,000 on nine separate occasions between August 12 and August 29, 1966. On September 2, he withdrew $500 reducing the balance in his checking account to approximately $1700.

On September 12, 1966 Mazzochi once more appeared at Royal with twelve Treasury Notes totaling in face value $72,000. Since Kayner had been transferred, Santoro brought the transaction to the attention of another officer of Royal, Edward I. McGraw. Santoro advised McGraw of the prior sales. The record is not clear as to whether McGraw knew at that time that Mazzochi had made the earlier substantial cash withdrawals. Because McGraw died prior to the trial, his deposition was admitted as testimony at trial. As an officer of Mutual which had maintained a moderate four-figure account at Royal, Mazzochi was known by McGraw on a first name basis for two years. Mazzochi informed McGraw that the notes were his. Although McGraw advised Mazzochi that a transaction of this size was unusual, he gave his approval and the notes were forwarded to Merrill Lynch for sale as in the previous cases. When the proceeds of this sale were received from Merrill Lynch, McGraw had been made aware of Mazzochi's previous withdrawals. His concern was that the substantial sums withdrawn might constitute a violation of Federal Reserve regulations. He ordered the proceeds of the sale to be held in a suspense account rather than in Mazzochi's personal account until further inquiry could be made. McGraw contacted Royal's General Counsel who advised him to obtain an affidavit from Mazzochi certifying that he was the owner of the notes. McGraw also discussed the matter with the Cashier of Royal's main office, Peter Walter, who called both the FBI and the Secret Service. Royal's counsel also called counsel to the Deputy Comptroller of the Currency. No information was received·from any agency contacted that these Treasury Notes had been reported stolen or missing. In fact, no such information could have been given since Hutton made no report until November 2, 1966 when, at the urging of the

USF&G, it advised the FBI and the police that the notes were missing. The court below found that this nondisclosure was deliberate on the part of Hutton in order to avoid the adverse publicity which might have resulted if a report were made.

On September 20 Mazzochi executed an affidavit in McGraw's presence swearing that he was the rightful owner of each of the notes which had been sold. Mazzochi, unable to obtain the funds, retained counsel in an effort to persuade the bank to release them. On September 29, 1966 the proceeds of the sale were credited to his personal account. The energetic Mazzochi promptly withdrew $10,000 in cash on September 30 and $61,000 on October 3, 1966.

## II

On appeal the parties agree that Royal's liability is to be determined by New York law which here is codified in the Uniform Commercial Code § 8–318 which provides:

> An agent or bailee who in good faith (including observance of reasonable commercial standards if he is in the business of buying, selling or otherwise dealing with securities) has received securities and sold, pledged or delivered them according to the instructions of his principal is not liable for conversion or for participation in breach of fiduciary duty although the principal had no right to dispose of them.

The issue as to Royal's liability therefore turns on whether it acted in good faith, taking into account the observance of reasonable commercial standards in its dealings with Mazzochi. Royal on this appeal argues that since it was not "in the business of buying, selling or otherwise dealing with securities" but merely did this as an accommodation for its customer for which it received no fee, the commercial standards test should not be applied but only a more lenient test of good faith simpliciter. The trial court assumed that the bank had to observe reasonable commercial standards and found that it had. We see no merit to the argument Royal now urges. Appellee

cites no authority for its position, Royal was commercially sophisticated and while it was not in the business of buying and selling securities, it was "otherwise dealing with securities." Even absent the statute, in determining good faith Royal's status as a commercial bank would be a factor to be considered. See *United States Fidelity & Guaranty Co. v. Goetz*, 285 N.Y. 74, 32 N.E.2d 798 (1941); cf. W. Prosser, Torts § 108 (4th ed. 1971).

The court below found that *Gutekunst v. Continental Insurance Co.*, 486 F.2d 194 (2d Cir. 1973), controlled its decision. In that case, in determining whether a bank which took as collateral for a loan stolen bearer bonds was a good faith purchaser under the Code,[1] we held that, "the New York law is that only actual knowledge or disregard of suspicious circumstances may constitute evidence of bad faith." Id. at 195–96. USF&G does not argue that Royal had actual knowledge that the notes involved here were stolen but rather that the bank disregarded suspicious circumstances and thus did not observe the reasonable commercial standard test of N.Y.U.C.C. § 8–318.

■ While USF&G argues on appeal that certain findings of fact relied upon by the court below are clearly erroneous, the thrust of its argument is actually that the court below, in making the determination that Royal acted professionally and reasonably in light of appropriate commercial standards, erred in its application of the law to the facts it found. In reviewing that determination we do not consider ourselves limited to the "clearly erroneous" standard but conclude that we have a plenary scope of review. *In re Hygrade Envelope Corp.*, 366 F.2d 584, 587–88 (2d Cir. 1966).

■ We cannot agree with appellant that Royal had no right to rely on Mazzochi's representation that his family owned the notes which were forwarded by Royal to Merrill Lynch in the August 4, 5 and 9 transactions. As we have indicated, Mazzochi was no stranger to the bank or its personnel. He had been introduced by local reputable businessmen as an officer of a credit union which had been a long time customer of the bank, albeit with a modest account. Kayner who approved the initial transactions knew Mazzochi as a bank customer. There was no indication of any irregularity on the face of the notes which were in bearer form and thus were freely negotiable. The proceeds of each transaction were deposited in Mazzochi's personal checking account and no withdrawals were made until August 9 which was contemporaneous with the third described transaction. While it is true that appellant's expert witness Mr. Frank W. Sixt testified that the bank should not have dealt initially with Mazzochi without further inquiry, we note that the trial court, which had the opportunity of observing the witness, discredited his testimony as biased. In reviewing that testimony, we note that Sixt would not have honored the initial $10,000 transaction even if the bank had known more about Mazzochi, including the fact that the State Banking Department had approved him as an officer of the credit union. This inflexible attitude is overly rigorous and justifies the position of the district court judge in not crediting his opinion.

Appellant also argues that the release by Royal of the proceeds from the sale of the last $72,000 of Treasury Notes from the suspense account on the strength of Mazzochi's affidavit of ownership was improper and a breach of reasonable commercial standards. Since as we have indicated Mazzochi had withdrawn in cash the bulk of the proceeds of the notes previously transferred

---

1. That case involved the construction of N.Y. U.C.C. § 8–304(3). N.Y. U.C.C. § 8–301(2) provides that a bona fide purchaser of securities acquires them free of any adverse claim. According to § 8–302 a party is a bona fide purchaser only if he is without notice of any adverse claim, and § 8–304 provides that a purchaser of securities has knowledge of an adverse claim if he has knowledge of such facts that his action in taking the security amounts to bad faith. This section therefore is directly pertinent in determining the liability of Merrill Lynch. In the discussion of what constitutes bad faith it is persuasive in our construction of N.Y. U.C.C. § 8–318 and appellant does not argue otherwise.

by Royal to Merrill Lynch for sale, the issue is closer than that presented by the earlier August transactions. Nonetheless on balance we see no violation of the good faith standards set forth in section 8–318.

In *Gutekunst v. Continental Insurance Co., supra,* the possessor of the stolen bearer bonds presented as collateral to the bank for a loan was a total stranger to the bank. He was introduced by a person who had previously introduced other borrowers to the bank. In that case the bank not only initially advanced $11,500 on the collateral of $23,000 worth of bearer bonds but on three subsequent transactions had advanced further sums on the strength of the same collateral until over $21,000 had been extended and default occurred. The bank never made an investigation of any kind of the borrower or of his authority to transfer the securities. We found in *Gutekunst* that there was no duty to investigate and concluded that the bank was a good faith purchaser of the notes within the Code and the New York cases.

As we pointed out, Mazzochi had prior dealings with Royal and there was nothing to indicate that his credentials were suspect. Although Mazzochi had withdrawn some $140,000 in cash from his account which was somewhat suspicious, his reluctance to leave that amount of money in a checking account which paid no interest is understandable. These transactions had been in progress for more than a month and no report that the notes were missing or stolen had been received by the bank. Moreover, McGraw's unease seemed to have been prompted in part by a fear that the large withdrawals in a short period might be violative of Federal Reserve regulations.

It is not accurate as appellant urges that the release was made simply on the basis of the Mazzochi affidavit. McGraw had alerted a bank officer at the main office as well as outside counsel. Inquiries addressed to appropriate federal agencies did not reveal that any of the notes were stolen or missing. When the funds were placed in a suspense account Mazzochi did not disappear. On the contrary, he made personal visits to Royal on a daily basis and retained counsel to press his claim. On the basis of all these facts we cannot disagree with the determination below that the bank acted in good faith and did not violate reasonable commercial practices. We therefore do not reach the alternative holding below that Hutton's contributory negligence in failing to report the missing notes until November, 1966 now estops USF&G from recovering and consequently express no view as to that issue.

### III

Appellant agrees that Merrill Lynch as the purchaser of the notes in issue is not liable for conversion if it is a purchaser in good faith. N.Y. U.C.C. § 8–301(2). Under section 8–304(3) a person is charged with notice of any adverse claim if he has "knowledge of such facts that his action in taking the security amounts to bad faith." USF&G argues that Merrill Lynch as a broker was obliged to observe reasonable commercial standards in the sale of the Treasury Notes and that the governing criteria are provided by Rule 405 of the New York Stock Exchange, the so-called "know your customer rule" which requires the broker to:

> Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization.

New York has held that a brokerage firm seeking the advantage of the good faith purchaser protection of section 8–304(3) must comply with Rule 405 of the New York Stock Exchange. *Hartford Accident and Indemnity Co. v. Walston & Co.,* 21 N.Y.2d 219, 287 N.Y.S.2d 58, 234 N.E.2d 230 (1967). Assuming that the Rule is applicable and that USF&G is entitled to its protection,[2] we find that Merrill Lynch was in

---

**2.** In *Hartford Accident & Indem. Co. v. Walston & Co.,* 21 N.Y.2d 219, 226, 287 N.Y.S.2d 58, 66, 234 N.E.2d 230 (1967), the New York Court of Appeals held that for a selling broker

good faith and is entitled to the protection of section 8–304(3).

In *Walston & Co. Inc., supra,* a dishonest employee of Bache & Co. took stock certificates which were endorsed in blank and succeeded in having new certificates issued in the fictitious name of Jack Arbetell. Someone identifying himself as Arbetell called Walston on the phone indicating that he would like to transact some business which involved the sale of securities. An unknown man then appeared at the Walston office identifying himself as Arbetell displaying one or two cards imprinted with that name. The stock endorsements were signed by the new customer and his identity was certified by Walston employees who didn't know who he was except that he had so identified himself. Walston sold the investment securities and paid the proceeds of sale to Arbetell. The New York Court of Appeals held that *Walston* was not a bona fide purchaser under the Code and that the reasonable inquiry required by NYSE Rule 405 would have disclosed the fact that Arbetell was not authorized to make the sale.

Merrill Lynch argues that *Walston* is distinguishable since the securities there involved were investment securities requiring endorsement while the notes here were bearer instruments. However, the Court of Appeals indicated, "Even in the sale of a bearer bond there is a duty to take some steps to know who the customer is. . . [However,] [t]he selling broker is charged with a somewhat greater responsibility where he receives a stock certificate issued in a particular name. In such instance he is required to use due diligence to ascertain the identity of the person with whom he is dealing and who signs the indorsement.". 287 N.Y.S.2d at 67, 234 N.E.2d at 236.

Appellant argues that since the transmittal slips from Royal to Merrill Lynch stated on their face that these transactions were "for the account of Frank Mazzochi, Jr.", Mazzochi was the customer of Merrill Lynch under the *Walston* interpretation of Rule 405. Strictly speaking, the *Walston* holding that the broker is obliged to use due diligence to ascertain the identity of its customer is limited to a customer who seeks to sell investment securities and who signs the endorsement. However, assuming that we are bound by the dicta that "even in the sale of a bearer bond there is a duty to take some steps to know who the customer is," we cannot find any violation of NYSE Rule 405 in this case. In *Walston* Arbetell was dealing directly with the broker; in effect, he walked in off the street with no references except one or two business cards. Here Mazzochi did not deal at all with Merrill Lynch. The transaction was made by Royal which was an established customer of the brokerage firm. Absent knowledge of any suspicious circumstances, and none here can be charged to the knowledge of Merrill Lynch, it had the right to rely on Royal with whom it had been dealing over the years. In our view, it would be inappropriate and in fact unduly onerous to require a broker which deals on an everyday basis with commercial banks or other institutional customers to make inquiry as to the bona fides of its customers' customers. In the absence of any knowledge of

to meet the good faith standards under U.C.C. § 8–304, it must have conducted an inquiry into its customer that would satisfy NYSE Rule 405. Although there is indication in some federal cases that a stranger to the transaction between broker and customer (here Hutton which was not a customer of Merrill Lynch) might invoke the protection of Rule 405, see *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 410 F.2d 135 (7th Cir.), cert. denied, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969); *Bush v. Bruns Nordeman & Co.,* [1972–1973 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 93,674 (S.D.N.Y. 1972), this point is not settled. In *Walston,* the New York court, without discussion held that a

third-party could invoke Rule 405 through its construction of U.C.C. § 8–304. Although as a federal court we cannot reconsider a state court's conclusion as to what constitutes a "reasonable commercial practice" under its statute, we can, however, when that statute purports, as here, to incorporate a federal standard, correct any misconstruction of federal law. *Standard Oil of Calif. v. Johnson,* 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942). Because of our disposition in this case however there is no need to reach the question of whether Rule 405 protects a third party. Therefore we express no opinion on the issue.

irregularity or suspicious circumstances which would put the broker on notice of possible irregularity, we hold that the broker (Merrill Lynch) has the right to rely upon its customer's (Royal) observance of reasonable commercial standards in that customer's dealing with its own clients (Mazzochi).

The judgment is affirmed.