**FIRST NATIONAL BANK OF CICERO, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

No. 83 C 2459.

United States District Court, N.D. Illinois, E.D.

Jan. 30, 1987.

Michael P. Mullen, Tom W. Stonecipher, Stephen C. Voris, Burke, Griffin, Chomicz & Wienke, Chicago, Ill., for plaintiff.

Michael W. Coffield, David L. Carden, Andrew F. Sears, Coffield Ungaretti Harris & Slavin, Chicago, Ill., for defendant Lewco Securities Corp.

John W. Dondanville, Thomas A. Doyle, Donald J. Hayden, Baker & McKenzie, Chicago, Ill., for defendants Thompson McKinnon Securities Inc. and Donaldson, Lufkin & Jenrette Securities Corp.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Defendants Thompson McKinnon Securities, Inc., Donaldson Lufkin & Jenrette Securities Corp. and Lewco Securities Corp. move for reconsideration of this court's denial of their motion for summary judgment. *First National Bank of Cicero v. United States*, 625 F.Supp. 926 (N.D.Ill. 1986). They argue in effect that this court got lost in the legal and factual complexities of this case. Though there are disputed facts, they contend that the disputes are not material, since under either version of the facts the result is the same.

On reconsideration, we find that defendants are partly right. A factual dispute prevents summary judgment only if that dispute is material—in other words, if it matters to the outcome of the case. It is legal theories which make facts material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. ——, ——, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). This court got so involved in advancing alternative factual scenarios and alternative legal theories for the parties that we missed some points of intersection between them.

Also, since we ruled, the Supreme Court has clarified the relation between (1) the movant's burden of proof on an issue for purposes of a summary judgment motion and (2) what an opposing party may fairly be required to show to defeat the motion when he would have the burden of proof on that issue at trial. *See Anderson*, 477 U.S. at ——–—— 106 S.Ct. at 2510–2512; *Celotex Corp. v. Catrett*, 477 U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To succeed in this lawsuit, the Bank must establish that it was a bona fide purchaser of certain stolen securities despite the complicity of its loan officer, William Giova, in at least some aspects of a scheme to raise loans using those securities as collateral. Giova negotiated the loans which led to the Bank's possession of the securities. Because the Bank has not shown any likelihood that it could prove at trial that it could claim title to these securities other than through the acts of Giova, many of the factual disputes indeed become immaterial. We grant summary judgment for defendant Lewco as to the securities used as collateral for loans to M & P Cartage and its principals Edward and Edele Bontkowski. However, defendants have not shown the absence of dispute on the facts which would causally link that series of loans to the loans made to David Bruun. Thus the Bank could conceivably still prove bona fide purchaser status as to some or all of the securities given as collateral for those loans, and as to them summary judgment must be denied.

## FACTS

The basic fact pattern involved here is sketched out in this court's previous memorandum, 625 F.Supp. at 927–928, although there we erroneously attributed the interest in the Port of Corpus Christi Series 1981–A Revenue Bonds (Corpus Christi bonds) to defendant Donaldson, Lufkin & Jenrette Securities Corp. instead of defendant Lewco Securities Corp. *See also United States v. Bruun*, 809 F.2d 397 (7th Cir.1987) (criminal proceedings). In our memorandum we concluded that the key disputes were (1) whether or not Giova exceeded his authority in making the loans which led to this controversy; (2) whether or not he actually knew that the securities were stolen when he arranged those loans; and (3) whether or not knowledge that the Corpus Christi bonds used as collateral for the initial loan in the series, to M & P Cartage/Bontkowski, were stolen would have caused suspicion that the collateral Bruun offered was also stolen. We note again that at present no one disputes that if Giova (or anyone else) had checked with the Securities Information Center (SIC) before issuing the initial loan on February 25, 1982, he would have learned that the Corpus Christi bonds were stolen; that none of the other securities used as collateral for the following loans were so reported before the loans on them were made;[1] and that Giova at least knew that the borrowers were acquiring the loans fraudulently, intending to use the proceeds for other than their stated purposes, and indeed would use a portion of those proceeds as a reward to Giova for his assistance.

## DISCUSSION

In retrospect, we did not adequately consider in our prior memorandum and order that the Bank has some burden of production even as an opponent of a summary judgment motion. "[A] party opposing a properly supported motion for summary judgment ... must set forth specific facts showing that there is a genuine issue for trial ... [T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at —— – ——, 106 S.Ct. at 2510–2511 (citations omitted). "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at —— – ——, 106 S.Ct. at 2552–2553.

Plaintiff does not dispute that the securities at issue here were stolen. Thus the Bank, at trial, would have the burden of proving that it took the securities as a bona fide purchaser. Ill.Rev.Stat. ch. 26, ¶ 8–105(2)(d). In other words, the Bank would have to affirmatively show its good faith (or at least the absence of bad faith) and affirmatively show that it lacked notice. *Oscar Gruss & Son v. First State Bank of Eldorado*, 582 F.2d 424, 433 (7th Cir.1978); *Erlich v. Nyberg*, 78 Ill.App.3d 500, 509, 396 N.E.2d 1273, 1280, 33 Ill.Dec. 549, 556 (1st Dist.1979). Thus on this summary judgment motion the Bank has the burden of producing more than colorable evidence of those essential elements of its case.

To make that showing, the Bank must somehow escape the consequences of two

---

**1.** Many of the securities were never reported as stolen to the SIC. Of the ones which were, defendants have not correlated the dates of the reports on the specific items with the dates the Bank acquired those specific items by making loans on them, other than to show that the Corpus Christi bonds were reported two days before the loans on them were made. Plaintiff has made such a correlation through March 31, 1982, establishing that in each case other than the first loan, its acquisition of each item preceded the theft report by at least five days. Perhaps the timing after March 31 is not all as favorable to the Bank, but it is not this court's job to do defendants' homework for them. *International Administrators, Inc. v. Life Insurance Co. of North America*, 553 F.Supp. 82, 84 n. 4 (N.D.Ill.1982), *aff'd*, 753 F.2d 1373 (7th Cir. 1985).

undisputed facts: the knowledge of its agent Giova that at least some fraud was afoot, and the presence on the SIC data banks of a report of the theft of the Corpus Christi bonds. If Giova actually knew that the securities were stolen, then he knew of interests in them adverse to those of the bank. If the law imputes that knowledge to the Bank, then the Bank had notice of an adverse claim and cannot be a bona fide purchaser of the securities. Ill.Rev.Stat. ch. 26, ¶ 8–302. Even if Giova was not actually aware of the theft, he knew enough "suspicious characteristics of the transaction" that a trier of fact might well find that he purposefully avoided any inquiry for fear of what he would learn, which under the Uniform Commercial Code amounts to constructive notice of what he would have found with inquiry. *See* Ill. Rev.Stat. ch. 26, ¶ 1–201(25)(c); ¶ 8–304 and UCC comment 1; *Hollywood National Bank v. International Business Machines Corp.,* 38 Cal.App.3d 607, 615, 113 Cal. Rptr. 494, 498 (2d Dist.1974).

Similarly, if the Bank is chargeable with what was on the SIC computer, it had notice of an adverse claim to the Corpus Christi bonds. Moreover, if Giova did not check with the SIC, the Bank could be found in bad faith for failure to observe the reasonable commercial practice of checking with the SIC before making the transaction. *Cf. Gruss,* 582 F.2d at 434; *Insurance Co. of North America v. United States,* 561 F.Supp. 106, 115 (E.D.Pa.1983). This court finds that as to the Corpus Christi bonds, the facts the Bank sets forth to avoid the imputation of Giova's knowledge and to avoid constructive notice are at best merely colorable. Reconsidered in the light of the Bank's burden of production for the motion, no matter which way the disputes are resolved Giova's knowledge and constructive notice of the problems with the Corpus Christi bonds must be imputed to the Bank. However, since no SIC report about the other securities existed at the time the Bank made the transactions by which it acquired them, that imputation will not resolve all disputes about those securities.

## I. Imputing Giova's Knowledge to the Bank

The general rule is, of course, that whatever knowledge an agent acquires within the scope of his authority is imputed to his principal. *Cicero Bank,* 625 F.Supp. at 931. Thus we begin with the assumption that whatever Giova knew the Bank is charged with knowing. Plaintiff argues, however, that the dispute about precisely what Giova knew at the time of the transactions prevents reaching a result based on that assumption. Giova might have known that the bonds were stolen. If so, then, the Bank argues, he was acting squarely against the interests of his principal, because no bank would want to lend money on stolen collateral. And when an agent is acting adversely to his principal's interest, the law no longer presumes that he will fulfill his fiduciary duty to convey important information to his principal. So, ordinarily, it no longer charges the principal with the agent's knowledge. *Cicero Bank,* 625 F.Supp. at 932; *Evanston Bank v. ContiCommodity Services, Inc.,* 623 F.Supp. 1014, 1036 (N.D.Ill.1985); Restatement (Second) of the Law of Agency, § 282(1) (1958). Thus, says the Bank, before imputing knowledge to it which would destroy its bona fide purchaser status, it deserves a trial to see if its agent was actively defrauding it.

### A. "Sole Actor Doctrine"

Militating against that result, however, is the fact that Giova was the Bank's principal contact with the borrowers and thus the agent who procured the securities for the Bank. If an agent who was acting adversely to his principal was also the principal's representative in a transaction, and the principal seeks to retain the benefits of the transaction, we return to square one. The law will charge the principal with whatever that agent knew, as the fair price of claiming the benefit through the agent. *Cicero Bank,* 625 F.Supp. at 932, and cases cited there; Restatement of Agency, § 282(2)(c). The shorthand label for this

rule is the "sole actor doctrine." *See* Annot., 111 A.L.R. 665 (1937).

Plaintiff here is not simply trying to rescind a voidable transaction. Rather, the Bank seeks to keep the securities as a bona fide purchaser in the face of claims from the victims of the theft. Thus whether or not Giova knew they were stolen seems not to matter for purposes of imputation of knowledge. If he thought that the collateral was good despite the otherwise questionable transaction, then he had not totally abandoned his principal's interests and was not an adverse agent. In that case, the general rule imputing his knowledge would apply. *See, e.g., Center v. Hampton Affiliates, Inc.,* 66 N.Y.2d 782, 497 N.Y.S.2d 898, 488 N.E.2d 828 (1985). If on the other hand he knew it was bad collateral, nevertheless the Bank wants to keep it. In that case, his knowledge of the theft would come as part of the package of claiming the collateral through him.

The Bank avoided that conclusion in our prior ruling by seizing on the phrase "sole actor." Giova cannot have been the Bank's "sole actor" in the transaction, it contends, because he alone could not approve or complete a loan transaction for more than $50,000, and virtually all of these loans exceeded that figure. Loans of that size exceeded Giova's authority. Final approval rested with the Bank's chairman, Joseph J. Schuessler, and with an officer's loan committee. Moreover, the Bank's note teller physically received the collateral. Thus because others acted in relation to these transactions, Giova was not the sole actor. Or, at least, a trier of fact could so find, thus allowing the Bank to keep the securities while disavowing Giova's knowledge under the adverse agent exception.

We agreed last time that theoretically such a result was possible. On reconsideration, however, in light of the standards of *Anderson* and *Celotex,* plaintiff has not set out the facts which could support such a result. For example, the Bank does not contend that somehow the arrangement became an arm's-length transaction in which Giova first purchased the securities for himself and the Bank then purchased them from him. In such a case, where a person otherwise an agent was not functioning as an agent in that transaction, knowledge would not be imputed to the principal and the principal could have bona fide purchaser status. *See Strand v. Prince-Covey & Co.,* 534 P.2d 892, 894 (Utah 1975); Restatement of Agency, § 279, § 282 comment j; *cf. United States Fidelity & Guaranty Co. v. Royal National Bank,* 545 F.2d 1330, 1335–1336 (2d Cir.1976). However, the Bank obtained the collateral from the Bontkowskis and Bruun through the agency of Giova. Giova never owned it himself.

The "sole actor" label describes no more than a frequently occurring specific example of a general rule of both the law of agency and the law of restitution. If a principal's claim to property rests on the acts of his agent, he cannot both retain the property and avoid the legal effect of the knowledge the agent had when he acquired it. Restatement of Agency, §§ 8C, 274 and comment a. The real question is not how many people contributed some small act toward the transaction, but rather whether the principal's interest in the property ultimately depends on the acts of the agent. *See, e.g., Connecticut Fire Insurance Co. v. Commercial National Bank of San Antonio,* 87 F.2d 968, 970 (5th Cir.1937). The Bank does not suggest that anyone other than Giova actually represented the Bank in negotiations with the borrowers. Giova bargained with them for the terms of the exchange of loan for collateral, and through that exchange the Bank came into possession of the securities. Thus the Bank can only claim the collateral through his acts.

### B. Ratification Through Retention of the Benefit

The Bank contends, nevertheless, that Giova's knowledge should not be imputed if the transaction was outside his authority. It is true that ordinarily knowledge is not imputed to a principal when it is outside the scope of an agent's authority,

and it is also true that the scope of an agent's authority for purposes of imputation of knowledge is a question of fact. *See Evanston Bank,* 623 F.Supp. at 1034–1035. The Bank maintains that here Giova's authority is at least a disputed question which prevents summary judgment. However, again the dispute does not matter. If the loans were within Giova's authority, then he was a "sole actor." The Bank's title to the securities runs through him and his knowledge imputes to the Bank. If they were not within his authority, then the only possibility on this record is that the Bank nevertheless ratified his acts of making them. Indeed, retention of the benefits secured by an agent outside the scope of his authority is ratification. If there was a ratification, then the agent's knowledge is imputed to the principal precisely as if the transaction had been within the scope of his authority originally. *Advance Mortgage Corp. v. Concordia Mutual Life Ass'n,* 135 Ill. App.3d 477, 484, 481 N.E.2d 1025, 1031, 90 Ill.Dec. 225, 231 (1st Dist.1985); Restatement of Agency, § 98 and comment e, § 99.

Schuessler admits that he merely approved the terms of transactions set up by Giova, but attempts to characterize that approval, rather than Giova's negotiations, as the act through which title could be traced. The characterization is not persuasive. If the Bank had evidence that someone in addition to Giova actively participated in the transactions, representing the Bank in negotiations with the borrowers, then the Bank might have a chance of proving at trial that it had a claim to the collateral other than through Giova. The mere fact of Schuessler's approval, however, is far more consistent with ratification by a superior than with independent action. We would have to direct a jury to reach that result if the evidence before us now were the evidence at trial.

In short, no matter which route we take, the Bank still cannot assert its right to retain a benefit Giova acquired for it against innocent third parties while repudiating Giova's agency at the same time. *See also Corn Belt Bank v. Lincoln Sav-ings & Loan Ass'n,* 119 Ill.App.3d 238, 250–251, 456 N.E.2d 150, 159–160, 74 Ill. Dec. 648, 657–658 (4th Dist.1983). On this record, there is no genuine issue that the Bank acquired the securities through the acts of Giova. Regardless of the scope of Giova's authority, and regardless of whether or not he knew the securities were stolen, the Bank cannot assert an interest in the securities without being charged with the knowledge of whatever Giova knew. Restatement of Agency, § 104 comment d, § 263 and comments, §§ 274, 282(2)(c); Restatement of the Law of Restitution, §§ 28(c), 208(1) (1937). Thus we modify our previous opinion to the extent that it left the imputation of Giova's knowledge an open question. That knowledge must be imputed to the Bank as a matter of law.

## II. Notice of an Adverse Claim

The preceding conclusion, however, does not eliminate all difficulties. The question of what Giova actually knew is still disputed on the record before us. Obviously, to the extent that he knew any securities were in fact stolen, the Bank cannot be a bona fide purchaser of those securities. His knowledge of the adverse claim is imputed to the Bank. To the extent that he did not, however, there still may be a narrow route through which plaintiff could turn out to be a bona fide purchaser of some of them. The notice which deprives one of bona fide purchaser status is notice of an adverse claim. Knowledge of some fraud in the transaction is not necessarily notice that everything about the transaction is fraudulent. For example, Giova could have thought that even though his friends were unlikely to pay off the loans, nevertheless they came by the collateral honestly and the Bank would be no worse off in the end. Defendants have not submitted evidence which excludes that possibility for every security.

### A. Duty to Observe Reasonable Commercial Practices Regarding Inquiry

That line being open, we must turn to questions of notice. The portion of our

opinion which seems to have caused the parties the most confusion is the portion dealing with the relationship between Rule 17f–1 of the Securities Exchange Commission Lost and Stolen Securities Program, 17 C.F.R. § 240.17f–1(d)(1), and bona fide purchaser status. Defendants read the opinion as imposing on all purchasers a duty of inquiry with the SIC for every security acquired before bona fide purchaser status can be asserted. Plaintiff, on the other hand, thinks the opinion made inquiry or lack thereof only one factor for consideration, never decisive, regardless of the reason for the failure to inquire. We therefore attempt another analysis.

■ What we held, and hold again, is that to establish a status as bona fide purchaser of a security, an individual or institution which regularly deals in securities needs to be able to show that it observed reasonable commercial practices with respect to that security. 625 F.Supp. at 931. *Accord Royal,* 545 F.2d at 1333; *Insurance Co.,* 561 F.Supp. at 114.[2] In many situations, probably most, such a requirement will in effect impose a duty of inquiry with the SIC because the reasonable commercial dealer would have inquired under those circumstances. But it is the reasonable commercial practices, not the inquiry as such, which we held relates to U.C.C. requirements for a bona fide purchaser.

■ Reasonable commercial practices intersect the standards for bona fide purchaser in two related ways. If notice of an adverse claim was readily available through the observance of reasonable commercial practices, then the purchaser is deemed to have constructive notice of that claim and fails on that ground. Ill.Rev. Stat. ch. 26, ¶¶ 1–201(25)(c), 8–302, 8–304; *In re Legel Braswell Government Securities Corp.,* 695 F.2d 506, 513 (11th Cir. 1983); *Insurance Co.,* 561 F.Supp. at 116. In addition, the purchaser who has neglect-

ed to follow reasonable commercial practices will ordinarily be unable to demonstrate that he entered into the transaction in good faith. *Gruss,* 582 F.2d at 434; *Royal,* 545 F.2d at 1334; *Insurance Co.,* 561 F.Supp. at 114–115. Defendants, however, raised a good faith issue only tangentially on their initial motion and do not appear to reassert it now. Rather, their motion raises the issue of the relation of the SIC program to notice for bona fide purchaser status.

The place of an SIC inquiry in the overall ability of a purchaser to prove bona fide purchaser status will depend to some extent on the circumstances of the particular case, which is what we intended to indicate in our earlier opinion (and apparently failed). The difficulty in imposing an affirmative duty to inquire on a purchaser is that absent suspicious circumstances, bona fide purchaser law has never placed the initiative of investigation on the purchaser. *See, e.g.,* Ill.Rev.Stat. ch. 26, ¶¶ 8–304, 8–305; *Hollywood,* 38 Cal.App.3d at 614, 113 Cal.Rptr. at 498. In the old regime of written notice by mail, the victim took the first step by sending notification of lost or stolen securities to prospective purchasers. Once that communication was received, however, the institution was fairly on notice, and any failure to circulate it to proper persons or failure to check the files was no excuse. Ill.Rev.Stat. ch. 26, ¶ 1–201(27); *Morgan Guaranty Trust Co. v. Third National Bank of Hampden County,* 529 F.2d 1141 (1st Cir.1976). The question now is how to adapt that principle to the era of central, computerized data banks. The victim still must take the first step, but now that constitutes a report to the SIC. For the SIC system to be effective, however, the purchaser must also now make an affirmative act, namely picking up the telephone to call the SIC.

The Bank contends that expecting such an affirmative act of dealers for most transactions in securities would "effec-

---

**2.** The phrase "reasonable commercial practices" is adapted from the "reasonable commercial standards" of Ill.Rev.Stat. ch. 26, ¶ 8–318. That section is written on the assumption that the victim would be suing for conversion. How-

ever, it applies equally where, as here, the purchaser claims to be bona fide and is suing the victims for retention of the securities. *Insurance Company,* 561 F.Supp. at 113–114.

tive[ly] repeal" bona fide purchaser law with "staggering implications as to the negotiability of instruments" and "massive harm to commercial practices" (plaintiff's mem. at 8). We disagree. The burden of making a phone call is light, and courts have usually expected such minimal inquiry of a commercially sophisticated purchaser at any sign of suspicious circumstances. *See Legel Braswell,* 695 F.2d at 513. Expecting a call to accompany most transactions thus only slightly extends existing law. Nevertheless we do not hold that an SIC inquiry is necessarily required in every instance. Not even the SIC itself recommends an inquiry in every case. For example, it would not expect a call where the institution receives a security from a well known customer and registered in his name (aff. of M. Osborne at 6). Reasonable commercial practices would include reliance on a well known and hitherto entirely trustworthy customer. *Royal,* 545 F.2d at 1336. The requirement is observance of reasonable commercial practices, which will often, but not always, mean SIC inquiry.

### B. Constructive Notice

### 1. The Corpus Christi Bonds

■ The next question is how that principle applies to the instant case. Defendants have established that the SIC data bank showed a report of the theft of the Corpus Christi bonds before the bank made the first of its series of loans on those bonds. That evidence raises a strong presumption that if plaintiff had observed reasonable commercial practices in the transaction, it would have learned that the bonds were stolen. In other words, it raises a presumption that plaintiff had constructive notice of an adverse claim to the bonds. Because reasonable commercial practices is a question of fact, however, this court initially felt obligated to leave the question open. It was theoretically possible for the bank to show that in a particular instance reasonable commercial practices would not have turned up notice of the claim—for example, because no call to the SIC was expected in that instance.

On reconsideration, however, we failed to factor into the balance plaintiff's burden of proof on the issue. Frankly, last time this court became entangled in a mesh of its own making. Playing on phrases like "reasonable commercial practices" and the "due diligence" of Ill.Rev.Stat. ch. 26, ¶ 1–201(27), we suggested that plaintiff might be able to convince a trier of fact that it had done all that was necessary by setting up a system for calling the SIC. That system depended on Giova, and since Giova's state of mind was in question, whether the Bank was chargeable with notice through Giova was in question. Thus the Bank could keep the securities because Giova had perverted its observance of reasonable commercial practices.

We now see, however, that such an approach mischaracterizes the issue and confuses notice with knowledge. For this part of the inquiry, Giova's state of mind is irrelevant. Breakdowns in a purchaser's internal system for transmitting notice to the agent who needs it are no concern of innocent third parties. Ill.Rev.Stat. ch. 26, ¶ 1–201(27); *Thomson Printing Machinery Co. v. B.F. Goodrich Co.,* 714 F.2d 744, 748 (7th Cir.1983); *Morgan Guaranty,* 529 F.2d at 1142–1143. Indeed, for this issue it does not matter who the Bank's employee charged with doing an SIC check was, nor whether he failed to check because he was defrauding his principal, because he was negligent, grossly incompetent, or whatever. The Bank picked the agent, and as between it and an innocent third party, the Bank must bear the consequences of its choice. *See, e.g., Paul F. Newton & Co. v. Texas Commerce Bank,* 630 F.2d 1111, 1118–1119 (5th Cir.1980); Restatement of Agency, §§ 261–263. The Bank's remedy when an agent's malfeasance exposes it to loss is to sue the agent, not the victim of the theft. *See, e.g., Security Insurance Co. of Hartford v. Mato,* 13 Ill.App.3d 11, 298 N.E.2d 725 (2d Dist.1973); Restatement of Agency, §§ 379, 391, 399.

The issue here is whether the Bank as an institution was on notice of the claim, not whether that notice reached Schuessler or

any other particular individual.[3] The Bank would be on notice if, and as soon as, reasonable commercial practices required an SIC inquiry. The only system breakdown that might be relevant here would be one outside the Bank—for example, if the Bank could show that it called the SIC and the SIC's computers were down.

■ With the issue properly characterized, it becomes obvious that as to the Corpus Christi bonds, plaintiff has set forth no persuasive evidence which could meet its burden of proof for bona fide purchaser status. In this case there can be no genuine dispute on what the reasonable commercial practices should have been. Defendants submit unchallenged evidence that purchasers frequently check with the SIC, for example nearly 7,000 times a day in 1982. The Bank admits that its routine practice was to call the SIC, which admission seems highly probative of reasonable commercial practices. In addition, we have determined above that Giova's knowledge is imputed to the Bank, and no one seems to dispute that he at least knew of enough suspicious circumstances to trigger an inquiry. The Bank should have called the SIC. Since observance of reasonable commercial practices would have put the Bank on notice of an adverse claim, we hold that it had constructive notice of another claim to those bonds and cannot be a bona fide purchaser as to them.

### 2. The Remaining Collateral

■ Knowledge of suspicious circumstances, however, is not of itself notice of an adverse claim. *Peoria Savings & Loan Ass'n v. Jefferson Trust & Savings Bank,* 81 Ill.2d 461, 471, 410 N.E.2d 845, 850, 43 Ill.Dec. 712, 717 (1980). Neither is a duty to inquire equivalent to notice when the inquiry would not have turned up any reports of adverse claims. Defendants have

not shown that any other reports existed on the SIC data banks preceding the dates of the transactions in question here. Therefore, as to the remaining collateral, defendants do not raise the presumption that if plaintiff had observed reasonable commercial practices it would have learned of adverse claims. Thus they raise no presumption of constructive notice. At summary judgment, defendants have the initial burden of demonstrating the absence of a factual issue. Plaintiff claims it had no notice. The question is material and disputed. Lack of notice, and therefore bona fide purchaser status, is still possible as to the securities acquired as collateral through the loans to David Bruun.

■ Against that result, defendants contend that because the loan on the Corpus Christi bonds was the first of all the loans in dispute here, the report of their theft functions as constructive notice for every piece of collateral used in the scheme thereafter. Once the Bank knew those bonds were stolen, the argument goes, it was on notice that the rest of the collateral was bad. Here, however, at least on the evidence they have submitted, defendants are arguing from hindsight. This court and all the parties now know that the Bontkowski/M & P Cartage loans and the Bruun loans were part of a single scheme. However, knowledge or notice acquired after the transaction is irrelevant to bona fide purchaser status. What matters, of course, is whether the Bank can be charged with notice of an adverse claim at the time it took the securities as collateral. Ill.Rev. Stat. ch. 26, ¶ 1–201(25); *Schranz v. I.L. Grossman, Inc.,* 90 Ill.App.3d 507, 517, 412 N.E.2d 1378, 1387, 45 Ill.Dec. 654, 663 (1st Dist.1980). Defendants have not eliminated fact questions on that issue for the Bruun loans.

---

**3.** In the case of written notification sent to a large institution, the U.C.C. allows a reasonable time for a copy of the notification to get from the mail room to the individual concerned with the transaction. Ill.Rev.Stat. ch. 26, ¶ 1–201(27). *See Thomson,* 714 F.2d at 748; *Morgan Guaranty,* 529 F.2d at 1144 n. 5. That

provision, however, has no relevance to notice on a computer data bank where reasonable commercial practices require the purchaser to make the inquiry. The individual concerned with the transaction presumably makes the inquiry himself, or at least does not act until the inquiry is made.

We accept the chain of causation defendant wants to establish as to the further Bontkowski/M & P Cartage loans on the Corpus Christi bonds. The Bank was constructively on notice that the collateral was stolen, and by logical extension that these borrowers had just tried to pass stolen collateral to them, which has to affect any further loans to those borrowers. We also agree that if Giova knew at the time of any Bruun loan that Bruun and the Bontkowskis were working together in a scheme, it would probably be impossible for the Bank to prove bona fide purchaser status for the collateral to that loan. Giova's knowledge is imputed to the Bank, and that knowledge plus constructive notice of the theft of the first securities would add up to very suspicious circumstances. They would impose, at a minimum, a very wide-ranging duty of inquiry, going well beyond a mere call to the SIC. *See, e.g., Hollywood,* 38 Cal. App.3d at 615, 113 Cal.Rptr. at 498–499. That duty would again fall to the Bank as an institution. The fact that the failings of its own agent, intentional or otherwise, prevented the knowledge and the notice from reaching someone who would put them together and take action would not release it from the duty. *Newton,* 630 F.2d at 1119; *Insurance Co.,* 561 F.Supp. at 114–116.

However, defendants have not placed on this record any evidence on the question of Giova's knowledge of any connection between the Bontkowskis and Bruun at the time of the transactions. Defendants have hinged their motion on a domino theory: that if the first transaction falls, so do all the later ones. But they still have not set out the facts necessary to connect the dominoes, although this court pointed

out that gap in its earlier memorandum. 625 F.Supp. at 933. From other sources it would appear that at least some evidence on that point exists. Both Bontkowski and Bruun had some association relevant to the transactions with the loan broker David Berkowitz, whom Giova also knew and intended to go into business with. *Bruun,* 809 F.2d at 401–402. Indeed, Giova may have known more about the Bruun loans than Bruun did. *Id.* at 411. However, we must decide this motion on the record before us, and that evidence is not on it. Notice that one borrower's collateral is bad is not notice about an entirely different borrower's collateral without some reason to tie the two borrowers together. We grant that defendants have shown that Giova knew enough to trigger an inquiry to the SIC. But we reiterate that suspicious circumstances, standing alone, are not notice of an adverse claim. If the inquiry would not have revealed an adverse claim, then the Bank had no constructive notice.[4] The SIC data banks did not show adverse claims at the time each loan was made.

At trial, of course, the Bank must affirmatively establish its lack of notice, as well as its good faith, by a preponderance of the evidence for each security it seeks to retain. Since Giova's knowledge is imputed to it, that may well prove difficult. Before the court now, however, is defendants' summary judgment motion. Except for the Corpus Christi bonds, defendants have not shown the absence of factual dispute on the question of whether the Bank had notice of adverse claims when it took these securities as collateral. Therefore, except

4. If, as defendants assert, Giova (and therefore the Bank, since Giova was the agent charged with the duty) simply did not inquire of the SIC about any of the collateral, that fact would be relevant to bona fide purchaser status. But it would relate to the bank's good faith, not to the notice issue defendants raise here. *Gruss,* 582 F.2d at 434; *Insurance Co.,* 561 F.Supp. at 115. Moreover, even if defendants had raised good faith, we could not dispose of the remaining claims now on that ground. On defendants' motion for summary judgment, they would have the burden of affirmatively establishing

that Giova did not call. It is not undisputed, as defendants assert, that Giova did not call the SIC. Plaintiff says simply that it does not know whether Giova called or not. If a report existed for each piece of collateral, then the dispute would not be material. Defendants could show that either Giova did not call or else that he called and ignored the report. In either case, the Bank would not be a bona fide purchaser. But without a report on the securities other than the Corpus Christi bonds, defendants cannot at this stage eliminate the possibility that he in fact called and learned nothing.

for the Corpus Christi bonds, summary judgment must still be denied.

## CONCLUSION

Defendant Lewco Securities Corp.'s motion for summary judgment is granted, as plaintiff could not have been a bona fide purchaser of the Industrial Development Corporation of the Port of Corpus Christi Marine Terminal and Pollution Control Revenue Bonds, Series 1981A. The summary judgment motions of the other defendants are denied.