**ESTATE OF H. Robert GREENE and Lisa Greene, Plaintiffs,**

v.

**Sandy GLUCKSMAN and Mulsanne International, Inc., Defendants.**

**86 Civ. 9184 (MEL).**

United States District Court, S.D. New York.

Aug. 5, 1987.

Mark J. Alonso, New York City, for plaintiffs.

Robert M. Trien, New York City, for non-party Barnett Bank.

LASKER, District Judge.

Plaintiffs Lisa Greene and the Estate of H. Robert Greene allege that defendants Sandy Glucksman and Mulsanne International, Inc. have defrauded Greene and her father's estate of various monies and bonds, totalling over $300,000 in value. Glucksman is charged with having convinced Greene to turn over these large sums of money to him by spinning a complicated web of false promises and lies. One group of the bonds which Greene entrusted to Glucksman, a set of bearer bonds with the face value of $150,000, is now being held by the Barnett Bank ("the Bank"), a non-party located in Palm Beach County, Florida, as collateral for loans from the Bank taken out by Glucksman. Glucksman has defaulted on these loans and the bank now seeks to liquidate the bonds to satisfy the loans.

On December 9, 1986, an order was entered in this case which preliminarily enjoined defendants Sandy Glucksman and Mulsanne International, Inc. and

> their employees, agents, assigns, and any entity acting in concert with them having notice of this Order and any entity who is a holder or possessor of any sum of money, assets or property belonging or purporting to belong to Glucksman or Mulsanne (including, but not limited to certain bearer bonds ...) from ... selling, transferring, pledging or otherwise disposing of said money, assets or property without the prior approval of the Court.[1]

The Barnett Bank then moved to modify this order "so that the restraints in the Order are clearly not applicable to the Bank,"[2] on the grounds that this court lacked jurisdiction to enforce the restraining order against the Bank, which is located in Palm Beach County, Florida, and transacts no business in New York.

Based on the principle that a court may enforce an injunction against a non-party who is in active concert or participation

---

1. On February 9, 1987, this injunction was modified so as to except from its terms transactions "for fair value and in the ordinary course of business."

2. Letter Motion for Modification of Injunction, January 28, 1987, p. 2.

with an enjoined party, even if the non-party would not otherwise be subject to that court's jurisdiction, *see Waffenschmidt v. Mackay,* 763 F.2d 711 (5th Cir.1985), *cert. denied,* 474 U.S. 1056, 106 S.Ct. 794, 88 L.Ed.2d 771 (1986), the parties were given the opportunity to conduct discovery on the issue whether Barnett Bank had acted in concert with Glucksman in accepting the Greene Estate bonds as collateral. After this discovery was completed and the results presented to the court, it was determined that "the Estate of Greene has raised serious and substantial questions of fact as to whether Barnett Bank acted in concert with Glucksman in accepting the Estate of Greene's bond as collateral for Glucksman's loans," and that it was "impossible to conclude on the present record that the restraints in the [restraining] order are not applicable to the Barnett Bank." *Estate of H. Robert Greene v. Glucksman,* 86 Civ. 9184 (S.D.N.Y. April 1, 1987) (endorsement) [Available on WEST-LAW, DCT database].

At the request of the Bank, on June 1 and 3, 1987 an evidentiary hearing was held to develop further the record concerning whether Barnett Bank had acted in concert with Glucksman, at which the testimony of three witnesses was heard: 1) plaintiff Lisa Greene; 2) Paul L. Miller, Jr., the Bank officer who transacted Glucksman's loans and became Glucksman's employee; and 3) Michael Sears, a vice-president of the Bank.[3] The purpose of the evidentiary hearing was to determine two factual questions relevant to the Bank's motion: 1) whether Lisa Greene had authorized Glucksman to use the Estate's bonds as collateral for a loan from Barnett Bank; and 2) whether the Bank of Barnett's actions were sufficient to establish that the Bank was acting in concert with Glucksman.

Based on the evidence presented at this hearing, it is now concluded that the Barnett Bank did not act in concert with Glucksman sufficient to give this court jurisdiction to enforce the restraining order against the Barnett Bank. Because this conclusion is reached on the second factual question, it is not necessary to pass upon the first.

The following account summarizes the testimony heard and the evidence presented at the hearing. On September 30, 1986, Lisa Greene gave Glucksman $150,000 in bearer bonds. Glucksman signed a statement saying that the bonds would be returned to her "totally intact and free of any leins [sic] ... on or about October 10, 1986."[4]

Glucksman then took out two loans from the Barnett Bank: first, on September 29, 1986, Glucksman took out an unsecured loan for $100,000; second, on October 1, 1986, Glucksman took out a secured loan for $110,000, using the Greene bearer bonds as collateral.[5] Paul Miller, who was then a loan officer at the Bank, was in charge of Glucksman's account at the Bank and arranged these loans for Glucksman. Miller testified that when he requested collateral in the amount of $150,000 for the second Barnett loan of $110,000, he had in mind that the collateral would also cover $40,000 of the first, unsecured loan. Miller also testified that Glucksman told him that he obtained the $150,000 in bonds in a "swap."

At the same time that these loan transactions were occurring, Miller and Glucksman began to discuss the possibility of Glucksman's hiring Miller as chief financial officer of Mulsanne International, a corporation which Glucksman controlled. Miller testified that his annual salary at the Bank was $60,000, and that Glucksman offered

---

**3.** Glucksman was given notice of this hearing and afforded an opportunity to testify. However, Glucksman and his counsel chose not to attend.

**4.** Plaintiffs' Exhibit ("PX") 5. Plaintiffs' exhibit numbers refer to the bound volume of exhibits which plaintiffs submitted with their motion for summary judgment.

**5.** PX 14. The actual Barnett Bank forms on which these two loans are recorded state that both loans were executed on October 1, 1986, and the $100,000 loan, not the $110,000 loan, was collateralized. Miller testified that the Bank forms are incorrect due to clerical mistakes.

him a salary of $150,000. Miller gave notice to the Bank around October 9, 1986, became an officer of Mulsanne around October 24, 1986, and left his employment at the Bank around November 1, 1986. Miller testified that he had high expectations for his job with Mulsanne, because it offered him the opportunity to become the chief financial officer of a business concern which he thought would quickly become a publicly traded multinational corporation.

On October 24, 1986, Greene gave Glucksman $200,000 in non-bearer bonds and $55,000 in bearer bonds. Glucksman signed a statement in which he promised to return to Greene "these [bonds] intact and unused on Monday, November 3rd 1986 together with the other bonds currently in my charge," and to give Greene $15,000 by that date.[6] Greene also wrote a note saying that this second set of bonds were "to be lodged as collateral *only* ... with the understanding that they will remain in the vault of the Barnett Bank ... under the authority of Paul Miller" (emphasis in the original).[7]

Within the next few days, Miller, although still an employee of the Barnett Bank, acted as Glucksman's agent in arranging a loan for Glucksman from the Flagler Bank, also located in Palm Beach, Florida. Miller testified that there is stiff competition amongst banks in Palm Beach County for commercial loan business, but he went to Flagler Bank rather than to Barnett Bank for this second loan because he thought it would be better for Glucksman to diversify his loan burden. Glucksman brought Miller the second set of Greene bonds, consisting of $200,000 in non-bearer bonds and $55,000 in bearer bonds, to use as collateral for the Flagler Bank loan. Miller saw the note from Lisa Greene which accompanied these bonds but did not question Glucksman about it. He advised Glucksman to return the $200,000 in non-bearer bonds to Greene because it would take too much time to do the paperwork and legal documentation necessary to use them as collateral. Miller also testified

that he "assumed" that the non-bearer bonds belonged to Glucksman himself.

As indicated above, around November 1, 1986, Miller became an employee of Mulsanne International. Several months later he quit because, among other reasons, his salary was not being paid and he realized that Glucksman had misrepresented his personal wealth and the condition of his business affairs. Since that time, Miller has been unemployed. Glucksman never repaid any portion of his loans to Barnett Bank and the Bank now seeks to liquidate the first set of Greene bonds which Glucksman put up as collateral.

Miller testified that at the time he arranged Glucksman's loans he was familiar with the Barnett Bank's Loan Procedures/Documentation Manual ("the Manual").[8] This manual outlines the procedures which bank officers are required to follow in processing, administering and documenting loans. Although Miller testified that he followed the procedures outlined in the Manual, it is clear that in fact he failed to follow almost all of the Manual's most basic requirements. For instance, the Manual requires that individual borrowers must submit a complete and signed financial statement together with copies of their most recent income tax returns. The financial statement should be submitted on a Barnett Bank form which calls for a detailed accounting of the potential borrower's assets, both solely and jointly owned, his liabilities, banking relationships, accounts, loans and notes receivables, life insurance policies, stocks and bonds, and real estate holdings. *See* Manual at I. 7–24. The Manual also requires that loan officers check each prospective borrower's previous credit experience, by examining either the Bank's own internal records *or by examining external sources* of credit information such as credit bureau reports and the records of other financial institutions at which the customer has previous financial experience. *Id.* at I. 25. Finally, the Manual requires that prior to

---

**6.** PX 7.

**7.** PX 11.

**8.** PX 15.

accepting any securities as collateral, the loan officer must call the Security Information Center, a centralized securities authentication center, to verify the legitimacy of ownership. *See* Manual at XII. 20–21.

Miller, however, complied with none of the requirements listed above. He obtained neither a tax return nor a financial statement of any kind from Glucksman, and performed only the most cursory credit investigation.[9] Instead, Miller testified that he based his decision on his observations of Glucksman's free-spending lifestyle and on Miller's "intuition" that Glucksman was a good credit risk. Miller telephoned a British accountant and met with a business associate of Glucksman's, both of whom Glucksman had listed as references, but never received any written references or even bothered to record the information learned from his conversations in a written memorandum. Finally, Miller did not contact the Security Information Center to verify the legitimacy of the bonds Glucksman posted as collateral until several days after both loans had been approved and executed.

More generally, although Miller admitted that a borrower's income, cash flow and liquidity were three important factors to consider in assessing a borrower's creditworthiness, his testimony revealed that he knew almost nothing about Glucksman's financial condition beyond what Glucksman told him orally. Miller testified that Glucksman told him that his annual income was $150,000, but although Miller admitted that it was important to know the sources of a borrower's income, he said that Glucksman was not specific about the source of his income. Miller also testified that Glucksman told him that he had ten million dollars in assets, but that again Glucksman was not specific about what or where these assets were, except to say that he had bonds and securities in Europe, an assertion which Miller said he could not verify. Miller testified that he knew that Glucksman rented rather than owned his luxurious house, but that he did not know whether he owned or rented his various sports cars. He didn't remember whether he had asked Glucksman whether he owned any real property or if he had inquired about Glucksman's cash flow.

\* \* \* \* \* \*

Greene argues that the evidence presented at the hearing compels the conclusion that the Bank of Barnett acted in concert with Glucksman in his scheme to defraud Greene, and hence, that the Bank is bound by the restraining order. Greene contends that the Bank was not a bona fide purchaser of the bonds because Miller's paltry investigation of Glucksman's creditworthiness, coupled with his obvious interest in currying Glucksman's favor in order to obtain employment with Mulsanne, establish Miller's "willful ignorance" as to Glucksman's authorization to pledge the bonds. *See Gutekunst v. Continental Insurance Co.*, 486 F.2d 194, 195–96 (2d Cir.1973) ("disregard of suspicious circumstances may constitute evidence of bad faith" sufficient to strip bank of bona fide purchaser status under the UCC); *accord, Garner v. First National City Bank*, 465 F.Supp. 372, 382–83 (S.D.N.Y.1979). Greene further argues that under the "sole actor" doctrine of agency, Miller's actions and knowledge can be imputed to the Bank, even if some of Miller's actions in approving the loans were adverse to the Bank's interests, because "[i]f a principal's claim to property rests on the acts of his agent, he cannot both retain the property and avoid the legal effect of the knowledge the agent had when he acquired it." *First National Bank of Cicero v. United States*, 653 F.Supp. 1312, 1317 (N.D.Ill.1987).

There is no doubt that Miller's actions in approving Glucksman's loans after such an alarmingly cursory investigation at the same time that he was negotiating with Glucksman for a better-paying job bordered on the egregious. It may also be true that Miller willfully overlooked suspicious circumstances in accepting the

---

**9.** On October 1, 1986, the day on which the second loan was completed, Miller submitted a memo to the file stating that a financial statement was being prepared. *See* PX 17. No such financial statement was ever submitted, however.

Greene bonds as collateral for Glucksman's Barnett Bank loans.

But the issue here is not whether the Barnett Bank was a bona fide purchaser of the Greene bonds under the Uniform Commercial Code. Instead, Greene must prove that the Bank acted in concert with Glucksman by actively participating in the scheme to defraud Greene. In *Waffenschmidt*, for instance, it was determined that the two non-parties who were found to be bound by the injunction had clearly worked with the party defendant in a common scheme to launder illegally obtained proceeds. 763 F.2d at 723–726. Here, in contrast, while there is evidence that Miller failed to observe reasonable commercial practices in regard to the Glucksman loans, there is no evidence that Miller actively aided or abetted Glucksman in the alleged scheme to defraud Greene of her bonds. In fact, Miller testified credibly that he had never heard of Greene or the Greene estate at the time he accepted the bearer bonds from the Greene estate as collateral for Glucksman's Barnett Bank loans. In sum, although Miller's perhaps deliberate negligence in failing to inquire into Glucksman's financial conditions or the source of his collateral might be enough to establish the Bank's bad faith under the Uniform Commercial Code, it is not enough to justify subjecting the Bank, which is a non-party over whom this court does not otherwise have jurisdiction, to the restraining order in this case.

This determination does not leave Greene without any means of redress against the Bank. There is nothing to prevent Greene from suing the Bank for money damages in either state or federal court in Florida.

Submit proposed order upon notice.